McShane and Rodgers *vs.* Howard Bank.

(Decided 14th November, 1890.)

JULIAN J. G. MCSHANE, and GEORGE H. RODGERS, SURVIVING EXECUTORS OF HENRY MCSHANE *vs.* THE HOWARD BANK.

*Official bonds—Breach—Liability of Sureties—Release of Sureties—Principal and Surety—Admissions as Evidence —Measure of Damages.*

The Howard Bank was empowered by its charter, (Act of 1847, ch. 88,) to take bonds for the corporation from all of its officers, agents, or servants appointed by the directors, with security, conditioned "for the faithful execution of the duties of such officers, agents, or servants, and to secure such corporation from loss;" and it was further enacted that such officers should take an oath "to discharge their several trusts diligently, honestly, and impartially." By the Act of 1854, ch. 222, borrowing of the Bank by its officers was prohibited under a penalty. The cashier of the Bank gave bond conditioned that he "shall well and faithfully discharge the duties imposed upon him as the cashier of said Bank by the charter and by-laws thereof." No by-laws were ever adopted, and the charter did not particularly describe the cashier's duties. HELD:

McShane and Rodgers *vs.* Howard Bank.

That the embezzlement by the cashier of the funds of the Bank, under the pretence that he had borrowed the same, was a direct violation of a duty imposed by the charter, which was to discharge his trusts honestly, and was a breach of the condition of his official bond, and his sureties were therefore responsible for the loss consequent upon his dishonesty.

The cancellation of a memorandum representing the cashier's indebtedness to the Bank, did not release the sureties on his bond, such cancellation having been effected through the use of certain accommodation promissory notes which he procured for the purpose of hiding, by simulated entries, his own and the president's defalcations, and for the further purpose of covering up, temporarily, losses sustained by the Bank on its discounted paper.

The release by the Bank of its president for a small part of his defalcation from all the balance, in no way operated to discharge the sureties of the cashier from liability for what he owed the Bank. They were not answerable for the president's dishonesty, and any adjustment made by the Bank with him to secure the return of a part of his indebtedness, and his release as to the balance, did not discharge the cashier from his duty to restore what was due by him, though both the president and cashier were wrong-doers.

A release by the president of the Bank of the sureties on the cashier's bond, did not release them from liability for any moneys taken and retained by him from the Bank prior to the date of such release, and did not estop the Bank from recovering payment therefor.

The failure by the directors of the Bank to give notice of the dishonesty of the cashier, if the same were known to them, to the sureties on his bond, and his retention in office, did not release the sureties, the failure of one officer of a corporation to discharge his duty not releasing the sureties of another from responsibility for the defaults of the latter.

The failure by the Bank to set-off the amount of the salary due to the cashier against the debt due by him to it, did not discharge the sureties on the bond which secured that debt.

The doctrine that, when the creditor parts with a security upon which he has a lien for the payment of the principal's debt, and to which the surety has a right of subrogation on paying the

McShane and Rodgers *vs.* Howard Bank.

debt, he impairs his claim against the surety, does not apply to a case where the principal, a bank cashier, has himself by means of fictitious entries, abstracted the certificate of stock which he had previously pledged to the Bank as security for money which he had embezzled.

The admissions of the cashier as to his indebtedness to the Bank, are competent, though not conclusive, evidence against his sureties.

In an action by a Bank against the sureties on the official bond of its cashier, to recover the amount of his defalcations, the amount proper to be recovered is the sum total of such defalcations, with interest on each sum embezzled from the time of its embezzlement.

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

*Exception.*—The plaintiff offered eight prayers, of which the five following were granted:

1. The Court instructs the jury that by the terms of the charter of the plaintiff no director or other officer thereof could lawfully borrow any money therefrom, and therefore Thomas S. Ridgaway could not, while cashier of the plaintiff, lawfully borrow any money from it, and if the jury shall find from the evidence that the said Thomas S. Ridgaway, while acting as cashier of the plaintiff, did at different times from April 30th, 1881, to February 10th, 1883, inclusive, take and retain in the form of a loan or loans, moneys of the plaintiff, then such taking and retention of said moneys were unlawful and in violation of the duties imposed upon him by the charter of the plaintiff; and if the jury shall further find that the moneys so taken by said Ridgaway were not returned or paid to the plaintiff, then their verdict must be for the plaintiff for an amount equal to the aggregate of the moneys so taken and retained by said Ridgaway, with

interest up to the time of their verdict upon each of said sum or sums of money from the time it was taken by the said Ridgaway, unless the jury find the facts stated in the defendants' fourth prayer.

4. If the jury find from the evidence that Thomas S. Ridgaway upon his leaving the employment of the Howard Bank—that is to say, on the 1st day of May, 1889, failed to pay over or account for to said bank any portion of the moneys of said bank under his charge as cashier thereof, after the date of the writing obligatory in the declaration mentioned, then the jury may, and ought to, infer that the said moneys so unaccounted for were wilfully wasted by the said Thomas S. Ridgaway or applied to his own use, and the defendants are liable to the bank for the money which he so failed to pay over or account for to the said bank, and the verdict of the jury should be in favor of the plaintiff in this case for such sum as the jury shall find the said Thomas S. Ridgaway so failed to pay over or account for to the said bank, and has never been paid or satisfied to said bank, and the jury should include in their verdict interest to the date of their verdict on said moneys so not accounted for by said Ridgaway from the time or times at which the jury shall find that the said moneys were received by the said Ridgaway and wasted by him, or applied to his own use, if they can find such date or dates from the evidence, unless the jury find the facts stated in the defendants' fourth prayer.

5. If the jury believe from the evidence that the late Henry McShane wrote to Thomas S. Ridgaway the letter of the 21st day of January, 1886, of which letter a copy was offered in evidence, and that the said Ridgaway caused the same to be delivered to Samuel Edmonds, the president of the plaintiff, and that the said Samuel Edmonds wrote and delivered to the said McShane in reply thereto the letter of the 22nd day of January,

McShane and Rodgers *vs.* Howard Bank.

1886, offered in evidence, the writing and delivery of said letters did not release or absolve the said Henry McShane nor the defendants in this case from liability to the plaintiff in this action for any moneys of the plaintiff which the jury may find from the evidence had prior to the writing of said letters and since the making of the bond sued on in this case, been taken and retained by the said Ridgaway while acting as cashier of the plaintiff, out of the moneys thereof in his charge as cashier, and not returned or paid to the plaintiff, nor does the writing and delivery of said letters as aforesaid estop the plaintiff from recovering from the defendants in this case a sum equal to the amount of its moneys so taken by the said Ridgaway, with interest from the date of the taking of said moneys to the time of the verdict.

6. That the president and directors of the plaintiffs were at all times bound to exercise all their power and authority according to their skill and ability, for the protection of the property and moneys of the plaintiff, and the promotion of the best interests of its stockholders, and they, therefore, could not authorize Thomas S. Ridgaway to misapply the funds of the bank nor to apply them to his own use; and even if the jury believe from the evidence that the directors of the plaintiff, or some of them, knew and connived at or concealed or even aided and abetted the cashier, Ridgaway, in misapplying the moneys of the plaintiff, such action on the part of the said directors, or such of them as participated therein, did not absolve the said Ridgaway from his obligation to repay to the plaintiff any of its moneys which he had, while acting as its cashier, taken and applied to his own use, and failed to return to the plaintiff, (provided the jury shall find that the said Ridgaway did in fact, while acting as such cashier, take and retain and not return to the plaintiff any of its moneys,) nor did they thereby absolve the sureties upon the bond of said Ridgaway as cashier, from

their obligation to indemnify the plaintiff for any losses which it might sustain from the taking by said Ridgaway and applying to his own use in the manner aforesaid any of its, the plaintiff's, moneys, and failing to return the same to the plaintiff.

7. If the jury believe from the evidence that the promissory notes of J. A. Renwick and others, mentioned in the testimony, dated on or about March, 1885, amounting in the aggregate to $75,000, or thereabouts, and also the ten notes of $10,000 each of Lieblich and others, dated on or about February, 1889, also mentioned in the testimony, were in fact borrowed by the officers of the bank and were shortly after their borrowing returned to the makers thereof, then such borrowing and return of said notes and the drawing of the checks against them, spoken of in the evidence, did not pay or discharge the obligation of Thomas S. Ridgaway to return to the plaintiff its moneys which he had theretofore taken and retained while acting as its cashier, nor discharge or release the sureties on his bond as such cashier, if the jury shall find that the said Ridgaway had so taken and retained said moneys while acting as the cashier of the plaintiff, notwithstanding the existence of the entries in the books of the plaintiff offered in evidence, referring to the said borrowed notes.

The defendants offered the fourteen following prayers:

1. If the jury find that the sum of $8,133 claimed by the plaintiff in this case, or any part thereof, was loaned to said Ridgaway by Samuel Edmonds, the then president of the bank, or that said Edmonds combined or conspired with said Ridgaway to enable the latter to procure said money wrongfully from the bank; and shall further find that after the reorganization of the bank, the new president and directors, with knowledge of said transaction, released the said Edmonds, by the paper offered in evidence, from any liability to the bank for

or on account thereof, then such release inured also to the benefit of his joint wrong-doer, Ridgaway, and his sureties, and the plaintiff cannot recover in this action for any such money.

2. If the jury find that the sum of $8,133, claimed by the plaintiff in this case, or any part thereof, was loaned to said Ridgaway by the then president of the bank, and that the president had the authority and was in the habit of making loans without the action of the board of directors, then the plaintiff cannot recover in this action for any money so loaned, unless the jury find that said president and said Ridgaway were acting in a corrupt combination with each other.

3. If the jury find from the evidence that Ridgaway was appointed cashier of the bank on the 14th day of May, 1879, and immediately entered on his duties, and that the bond sued on, dated June 26th, 1879, was executed on that date, then said bond was a collateral undertaking by Henry McShane to answer for the debt, default or miscarriage of another, and required a distinct consideration to give it efficacy, and as no such consideration appears upon its face, the plaintiff cannot recover in this case, unless the jury find that the giving of said bond formed part of the consideration for the appointment of said Ridgaway as cashier.

4. If the jury find that the $8,133, claimed by the plaintiff in this case, was represented by checks, which were for a long time carried by the paying teller as a call loan, and that subsequently promissory notes of responsible persons to an amount more than sufficient to liquidate said sum of $8,133, and all other call loans then being carried by said teller, were delivered to the said bank and discounted for the *bona fide* purpose of extinguishing said indebtedness, and the said checks representing said sum of $8,133 were thereupon delivered to said Ridgaway, then the jury may infer therefrom that

said indebtedness was thereby paid and extinguished, and if they do so find, then the plaintiff cannot recover in this action.

5. If the jury find from the evidence that the supposed wrongful indebtedness of said Ridgaway to the plaintiff in reference to said sum of $8,133, became known to the president and directors of the plaintiff, or to its finance committee, in or about the month of August, 1883, and that no notice thereof was ever given to any of the sureties on his bond until 1889; and shall further find that on or about January 21st, 1886, Henry McShane wrote the letter of that date offered in evidence, and that the president of the plaintiff wrote the letter dated January 22nd, 1886, offered in evidence, then the plaintiff cannot recover in this action, because no reasonable notice of said Ridgaway's default was given to said sureties.

5½. If the jury find from the evidence, that about August, 1883, the knowledge of the supposed wrongful appropriation of said sum of $8,133 by said Ridgaway came to the plaintiff, and shall further find, that with such knowledge the plaintiff continued said Ridgaway as its cashier, and continued to pay him his salary of $2,500 per annum, until May 1st, 1889, and during all that time gave no notice thereof to any of the sureties on his bond; and shall further find, that by reason of the failure to give such notice, said sureties lost the opportunity of having said sum of money or any part thereof made good by said Ridgaway, then the plaintiff cannot recover in this action, provided the jury believe that such delay in giving notice to the sureties was unreasonable.

6. If the jury find from the evidence, that after the supposed wrongful default by said Ridgaway in reference to said sum of $8,133, the knowledge thereof came to the plaintiff, and that for some years thereafter they

continued said Ridgaway in his position of cashier and continued to pay him a salary of $2,500 per year, and gave no notice of any sort to his sureties of said default, and the same was not known to any of said sureties, then it was the duty of said president and directors to retain said salary, or a reasonable portion thereof, on account of said sum of $8,133, and the plaintiff cannot recover in this action for any money which the jury may find could have been so retained by said bank.

6½. If the jury find that subsequent to the supposed wrongful appropriation of said sum of $8,133 by said Ridgaway, the same was known by the plaintiff, and that thereafter any money or securities were in the possession of said bank, the avails of which might have been applied in payment of said sum of $8,133, and that said bank failed and neglected to hold said securities or to apply the avails of the same or said money to the payment of said indebtedness, then the plaintiff cannot recover in this action any part of said sum of $8,133 which the jury may find might have been so paid or liquidated.

7. If the jury find that the $8,133 claimed by the plaintiff in this case, was represented by the checks which were for a long time carried by the paying teller as a call loan to said Ridgaway, and so entered upon the books of the bank in his (the teller's) daily settlements; and that these facts became known to the plaintiff about August, 1883, and that about February, 1885, for the purpose of standing an examination preparatory to entering the Clearing House, the promissory notes of Peter New, James M. Pouder, and others mentioned in the evidence, were delivered to said bank, discounted by it, and the proceeds carried to the credit of the transient discount account, that the checks offered in evidence were then drawn against said credits and handed to the paying teller in settlement of said indebtedness of said

Ridgaway and other call loans, and the checks of Ridgaway, representing said indebtedness, were thereupon delivered up to said Ridgaway by said teller, and shall further find that subsequently said notes were returned with the acquiescence of the board of directors to the makers, and the amounts charged against said makers and entered in the individual ledger under the heading of sundry accounts and so carried until the spring of 1889, and that the ten notes of $10,000.00 each, mentioned in the evidence, were delivered to said bank, discounted by it, and with the proceeds thereof the sums so charged against the makers of said first mentioned notes were liquidated and cancelled, and shall further find that during all that time no notice of Ridgaway's default was given to any of his sureties, and that the plaintiff continued him as its cashier, and paid him his salary of $2,500.00 per year, and that Henry McShane wrote the letter of January 21st, 1886, and that the president of the bank wrote the letter of January 22nd, 1886, then the plaintiff cannot recover in this action.

8. The defendants pray the Court to exclude from the consideration of the jury all declarations of Ridgaway as testified to by any of the witnesses in relation to his indebtedness to the plaintiff.

9. The defendants pray the Court to instruct the jury that they are not to consider any declarations of Ridgaway to the effect that he considered that he owed a debt of honor to the plaintiff, as in any way affecting the liability of these defendants.

10. There is no evidence in this cause legally sufficient under the pleadings to show that any duties were at any time imposed upon Ridgaway, as the cashier of said plaintiff, by its charter or by-laws, and, therefore, the verdict of the jury must be for the defendants.

11. There is no evidence legally sufficient to show, under the pleadings in this cause, that Ridgaway failed

to perform diligently, honestly and 'impartially any duties imposed upon him by the charter and by-laws of the plaintiff, and the verdict of the jury must be for the defendants.

12. The sureties upon the bond are not liable in this action for any act of said Ridgaway, unless for some violation of a duty expressly imposed upon him by the charter or by-laws of the plaintiff.

The Court (PHELPS, J.) granted the fourth prayer of the defendants and rejected their other prayers. The defendants excepted to the rejection of their prayers, and to the granting of the plaintiff's prayers. The verdict and judgment being against them, they have taken this appeal.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, IRVING, BRYAN, FOWLER, McSHERRY, and BRISCOE, J.

*William A. Hammond,* and *Samuel Snowden,* for the appellants.

*Samuel D. Schmucker,* for the appellee.

McSHERRY, J., delivered the opinion of the Court.

The Howard Street Savings Bank of Baltimore was incorporated in 1847 by the General Assembly of Maryland, and by subsequent legislation its powers were enlarged and its name was changed to the Howard Bank. By the third section of its charter, the *Act of* 1847, *ch.* 88, it was empowered to take bonds for the corporation from all or any of the officers, agents or servants appointed by the directors, with security conditioned in such form as they shall approve, "for the faithful execution of the duties of such officers, agents, or servants, and to secure said corporation from loss;" and by the

*third article of section seven* it was enacted that "the President, Treasurer, Directors and other officers and servants, before entering upon the duties of their respective offices, shall take an oath or affirmation before some justice of the peace of the City of Baltimore to discharge their several trusts diligently, honestly and impartially." *Section ten* of the *Act of* 1854, *ch.* 222, prohibited officers from borrowing from the bank, and made it a penal offence for them to do so. In March, 1879, Thomas S. Ridgaway was made cashier, and he held that position until May, 1889, when he was removed. On the twenty-sixth of June, 1879, he delivered to the bank a bond the condition of which is in these words: "The condition of the above obligation is such that if the above bound Thomas S. Ridgaway do and shall well and faithfully discharge the duties imposed upon him as the cashier of said bank by the charter and by-laws thereof, and all other duties which may hereafter be thereby imposed upon him as the cashier of said bank, then this obligation to be void, &c." There were no by-laws ever adopted, and the charter does not particularly describe the cashier's duties. Henry McShane, whose executors are the appellants in this proceeding, was one of the sureties on this bond. Between April, 1881, and February 17th, 1883, Ridgaway, in violation of his duty, took from the bank and applied to his own use the sum of $8,133.00, and never restored or returned it or any part of it. To recover this sum the pending action was brought in July, 1889. To conceal this defalcation, and a very much larger one on the part of Samuel Edmonds, the then president of the bank, a memorandum showing the exact amount of each default, as well as other items, was kept in the drawer of the paying teller and counted as cash. This system was practiced, apparently without the knowledge of the directors, until about March, 1885, when a different

scheme was devised and put into operation by Ridg-away. At that time the bank, desiring to become a member of the Clearing House, was required by the rules of the latter to submit to an examination by an expert. It then became necessary to get this memorandum out of the apparent cash, and this is how it was done: The cashier procured accommodation promissory notes amounting to some forty odd thousand dollars made by some of the directors and customers of the bank, and caused them to be entered on the discount book, but deducted no discount. He then carried the apparent proceeds of this fictitious discount, aggregating the full face of the notes, to the credit of the transient discount account which is checked out usually by the cashier; he then delivered to the paying teller sundry checks drawn by himself and the makers of these accommodation notes against this apparent or fictitious discount, and these checks produced a credit sufficient to take up the cash items represented by the memorandum. In other words, when the checks drawn against the transient discount passed into the paying teller's hands, he paid them by merely taking the memorandum out of the drawer. When the accommodation notes matured, cashier's checks were drawn, and the notes were taken up in that way but not paid, and an entry was made in the deposit ledger to the debit of an account called "Sundry Account," which was not, however, the regular sundry account. In 1889 the bank, being cramped, was notified by the Clearing House that it must submit to another examination, and the same scheme of borrowing notes, this time amounting to one hundred thousand dollars, was resorted to. These notes were passed through the same process and only apparently discounted. The bank examiner rejected these notes as assets, and a reorganization of the bank followed, its stockholders surrendering one-half of its cap-

ital to make good its heavy losses. The new board of directors caused suit to be brought on the bond of Ridgaway. In 1885 the finance committee, consisting of three of the directors, became aware of Ridgaway's defalcations, but the other members of the board of directors do not appear to have been apprised of it until the reorganization in 1889. During the time that Ridgaway was cashier he was regularly paid his salary, and upon his removal he delivered to the new president some certificates for shares of Baltimore and North Carolina Gold and Copper Mining Company. This stock the bank still holds. It is worth from five to thirty-five cents per share. In January, 1886, Mr. McShane addressed a letter to Ridgaway requesting to be released from the bond, and a few days later he received a reply inclosing the following letter from Edmonds, viz., "Henry McShane, Dear Sir: Your request to be relieved as bondsman for the cashier of this bank, Thomas S. Ridgaway, Esq., is hereby complied with from this date. Respectfully, Samuel Edmonds, President." After the reorganization the directors settled with Edmonds, receiving from him a small percentage of the amount he owed, and executing to him a release under the seal of the corporation.

There are several questions arising out of these facts and others to be noted hereafter, and they are relied on by Ridgaway's sureties to defeat a recovery on the bond. The first of these is presented by the demurrer filed to the replications assigning breaches. The plaintiff declared generally on the bond; the defendants craved oyer of the bond and charter of which the plaintiff made profert; the defendants then pleaded general performance, to which plea the plaintiff filed four replications assigning breaches, and to these the defendants demurred. The Superior Court overruled the demurrer, whereupon rejoinders were filed, and issues were joined thereon.

McShane and Rodgers *vs.* Howard Bank.

The first replication avers that the charter of the bank imposed upon Ridgaway the duty of discharging diligently, honestly and impartially the trusts of his office as cashier, but that he did not so discharge them in that he wrongfully converted and applied to his own use divers sums of money in his custody and under his control belonging to the bank. The second avers that he did not diligently, honestly and impartially discharge the trusts of his office as cashier in that upon ceasing to be cashier on May the first, 1889, he failed to account for or turn over to the bank $8,133.00 of its moneys which had come into his custody and under his control as cashier since April, 1881. The third avers that by the charter of the bank it was provided that no officer of the bank should borrow money from it, and that whilst Ridgaway was cashier he had under his control divers sums of money which he has ever since retained, pretending that he had borrowed the same from the bank; and the fourth avers that he did not diligently, honestly and impartially discharge the trusts of his office as cashier in that he wrongfully withdrew by drafts and checks divers sums of money, though he had no money on deposit with the bank, and to conceal his fraudulent doings made or caused to be made false and deceptive entries in the books of the bank in violation of his duty. Were these acts breaches of the obligation sued on?

Now, the argument shortly stated is this: The condition of the bond provides that Ridgaway shall well and faithfully discharge the duties imposed upon him as cashier by *the charter and by-laws;* there are no by-laws, and the charter imposes no duties upon him, therefore, no act that he did of those set forth in the replications was a breach of the condition of the bond, and consequently no liability has attached to his sureties.

The obligation of a surety is to be strictly construed and his liability is not to be extended by mere implica-

tion beyond the letter of his contract. Upon that contract he has a right to stand, and nothing can be lawfully imported into its terms to enlarge his responsibility. But still "the bond constituting the contract must have such construction given to it as to carry out the intention of the parties thereto." *Engler vs. People's Fire Insurance Company*, 46 *Md.*, 333.

Whilst the particular duties of the cashier are not set forth or described in the charter of the bank, there are, at least, two distinct duties imposed upon him thereby, the faithful observance of which was guaranteed by the obligation of the sureties. The third article of the seventh section required him, as one of the officers of the bank, to make oath that he would discharge his trusts diligently, honestly and impartially; and a subsequent statute expressly prohibited him from borrowing any money from the bank. However undefined his general duties might have been, that of being *honest* in his position was explicitly enjoined by the very terms of the charter. By these terms he was forbidden to avail himself of his official position to misapply or embezzle the funds of the bank, or to resort to any unlawful or dishonest device inconsistent with the diligent, honest and impartial performance of his trust. The charter exacted honesty of the officers, and whatever else it failed to require, that it unequivocally imposed. Aside from the consideration that the very nature of the employment involved that duty, the direct and mandatory language of the act imposed it, and imposed it, too, under the sanctity of an oath. Upon what principle can it be said that a cashier, whose sworn duty it is to discharge his trusts honestly, has not violated that duty by the embezzlement of the funds of the bank, even though the charter contains no provision forbidding him to steal? If he did steal, are his sureties relieved merely because the charter did not declare in so many words that he

McShane and Rodgers *vs.* Howard Bank.

should not steal?    If he did embezzle, has he done that
which the charter required him to swear he would do—
honestly discharge his trusts?    His embezzlement of
the funds of the bank was a direct violation of a duty
imposed by the charter—a duty which his sureties guar-
anteed that he would honestly perform.    The charter
prohibited an officer from borrowing money from the
bank.    If Ridgaway did nevertheless appropriate the
bank's funds, pretending that he had borrowed them,
he was clearly guilty of a breach of duty imposed by the
charter; and if loss resulted from that act his sureties
are liable within the strict letter of their engagement.

These conclusions seem to us to be perfectly clear and
entirely free from doubt or difficulty.    Entertaining this
view, we are of opinion that the replications demurred
to properly assigned breaches of the condition of the
bond, and that the demurrers were rightly overruled.
The same question was raised by the tenth, eleventh
and twelfth prayers presented by the appellants to the
Court below.    These prayers were properly rejected for
the reasons we have already given.

It was urged that the fictitious credit produced by the
pretended discount of the accommodation promissory
notes, and that the checks drawn thereon, whereby the
memorandum representing Ridgaway's indebtedness to
the bank was withdrawn from the paying teller's drawer,
operated as a payment of what Ridgaway owed, and that
his sureties are consequently released.    This contention
cannot be supported.    The accommodation notes were
procured for the purpose of hiding, by simulated entries,
the defalcations of the bank's officers, and for the
further purpose of covering up, temporarily, losses sus-
tained on its discounted paper.    False and fraudulent
credits were given and equally false and fraudulent
checks were drawn against those credits to conceal the
actual truth from the bank examiner.    The notes were

returned to the makers and not a dollar was ever paid upon them.    The whole transaction consisted only of untruthful entries made by a faithless officer to cover up his own dishonesty, and to misrepresent the real condition of the bank.    Under these circumstances the Court was entirely right in granting the appellee's seventh prayer, and in instructing the jury, under the fourth prayer of the appellants as modified by the Court, that these transactions furnished no defense to the sureties unless the promissory notes were discounted for the *bona fide* purpose of extinguishing Ridgaway's debt. And this would have been so even though the directors of the bank had been aware of and had participated in the fraudulent conduct of Edmonds and Ridgaway.    The directors owed a duty of fidelity to the stockholders, and their breach of that duty by participating in the malversations of executive officers, or by aiding the latter in their attempts at concealment, differs nothing in principle from a case where the directors deliberately authorize a cashier to plunder the funds of a bank, or to cheat the stockholders of their interest therein. "Every act of fraud, every known departure from duty, by the board, in connivance with the cashier, for the plain purpose of sacrificing the interests of the stockholders, though less reprehensible in morals or less pernicious in its effects than the cases supposed, would still be an excess of power from its illegality, and, as such, void as an authority to protect the cashier in his wrongful compliance." *Minor, et al. vs. The Mechanics' Bank of Alexandria,* 1 *Peters,* 70.    This principle was correctly announced to the jury in the sixth instruction given by the Court at the instance of the appellee.

The first prayer presented by the appellants asked the Court to instruct the jury that if they found that Edmonds loaned the money in question to Ridgaway, or if Edmonds conspired with Ridgaway to enable the lat-

ter to procure said money wrongfully; and that after the reorganization, the directors with knowledge of this, released Edmonds from any liability for or on account thereof; then such release enured to the benefit of the joint wrong-doer, Ridgaway, and his sureties. The Superior Court properly rejected this prayer. Edmonds had taken some thirty-eight thousand dollars of the bank's money wrongfully. Ridgaway had also taken eight thousand one hundred and thirty-three dollars. Each had violated his plain duty, and possibly each had helped the other to do so. But Edmonds is not a party to Ridgaway's bond either as joint obligor or surety. The release of Edmonds for a small part of his heavy defalcation from all the balance that he owed to the bank, could in no way operate to discharge the sureties of Ridgaway from liability for what their principal owed to the bank. The sureties of Ridgaway were not answerable for Edmond's dishonesty, and any adjustment made by the bank with Edmonds, with a view of securing something from him, neither increased nor diminished nor in any way affected their liability for the wrongful acts of Ridgaway. The causes of action against Edmonds and Ridgaway were distinct and separate, and though both were wrong-doers, they were not such joint tort-feasors as that the release of one from the result of his wrongful acts discharged the other also from the consequences of his. In ordinary cases of joint tort-feasors, if one is released from responsibility for an act jointly committed by both and for which each is liable to the full extent of the injury done, both are discharged. *Gunther vs. Lee, et al.*, 45 *Md.*, 60. But the primary civil liability of Edmonds and Ridgaway was separate, and extended to the amounts respectively due by each, though each incidentally might have been involved criminally in the penal act of the other. The obligation upon each was to restore that which he had taken. The extent of

that obligation was measured by the amount which each had abstracted. The return by one of them of any part of what he owed and his release as to the balance could not possibly discharge the other from his duty to restore what was due by him. As between the stockholders on the one hand, and Ridgaway's sureties on the other, no claim existed except as to Ridgaway's own misappropriations, and the release of Edmonds, for whom the sureties were in no manner bound, could not affect their liability for Ridgaway, for whom alone they were responsible.

The fifth prayer of the appellee has reference to the correspondence between the late Mr. McShane and Ridgaway. By that instruction the jury were told that the letter written on January 22d, 1886, by Edmonds to McShane did not release McShane from liability for any moneys taken and retained by Ridgaway from the bank after the date of the bond sued on, and prior to the date of that letter, and did not estop the bank from recovering payment therefor. There was no error in this. The defalcation had taken place between April the first, 1881, and February the seventeenth, 1883. The liability of Ridgaway's sureties was fixed long before this letter was written, and the president had no power to release them or any one of them upon his own authority, and thus voluntarily surrender a right which belonged, not to him, but to the stockholders. It was not within the scope of his agency to do it. *Morse on Banking,* 144.

But it has been insisted under the appellants' fifth and seventh prayers that if the indebtedness of Ridgaway to the bank was known to the president and directors or the finance committee in August, 1883, and if no notice thereof was given Mr. McShane by the bank, this failure to give notice, and the letter of January 22d, 1886, operated to release the sureties. These prayers were rejected. A creditor is under no obligation to be

actively diligent, in pursuit of his principal debtor. He may forbear the prosecution of his claim, and remain inactive, without impairing his right to resort to the surety, particularly when his forbearance amounts to no more than mere inaction or passivity. *Sasscer vs. Young & Kemp,* 6 *G. & J.,* 243; *Freaner vs. Yingling, et al.,* 37 *Md.,* 491. If the creditor is not bound to active diligence his mere failure voluntarily to give information to the surety of the default of the principal cannot have the effect of discharging the surety. *Forrester, et al. vs. State, use of Kernan,* 46 *Md.,* 154; *Pittsburg, Fort Wayne and Chicago Railway Co. vs. Shaeffer,* 59 *Pa. St.,* 356. This question was not involved in *Roberts, et al. vs. Woven Wire Mattress Co.,* 46 *Md.,* 374. But if this view was at all doubtful, the result would not be different in this case. The directors are not the creditors. The body corporate is. If the directors were derelict in not giving notice to the sureties, or if the directors even connived at the fraud of Ridgaway the sureties of the latter cannot claim exemption because of the neglect or misconduct of other officers. It is a sound principle that the failure of one officer of a corporation to discharge his duty does not release the sureties of another for responsibility for the defaults of the latter. "Corporations can act only by officers and agents. They do not guaranty to the sureties of one officer the fidelity of the others. The fact that there were other unfaithful officers and agents of the corporation, who knew and connived at his infidelity, ought not in reason, and does not in law or equity, relieve them from their responsibility for him. They undertake that he shall be honest, though all around him be rogues. Were the rule different, by a conspiracy between the officers of a bank or other moneyed institutions, all their sureties might be discharged. It is impossible that a doctrine leading to such consequences can be sound." *Pittsburg, Fort Wayne and*

*Chicago Railway Co. vs. Shaeffer*, 59 *Pa. St.*, 356; *Taylor vs. Bank of Ky.*, 2 *J. J. Marsh*, 564; *United States vs. Kirkpatrick*, 9 *Wheat.*, 720.    It is true some cases have held that where the employer has knowledge of the servant's fraud and dishonesty and still retains him, and gives no notice to the surety, the latter is discharged. *Atlantic and Pacific Tel. Co. vs. Barnes, et al.*, 64 *N. Y.*, 385; *Philips vs. Foxall, L. R.*, 7 *Q. B.*, 666.

However this may be, we are of opinion that the doctrine has no application to this case.    Conceding that Ridgaway was dishonest, and that the directors of the bank knew it and still retained him in his position without notice to the sureties, this could not release the sureties, even though it had been the duty of the directors to give such notice, unless it be held that the failure of one set of officers to discharge their duty will release the sureties of another delinquent officer; whereas, as we have seen, just the reverse is the law.

The prayers marked six and six and a half presented by the appellants and rejected by the Superior Court, sought an instruction to the effect, that if the bank had knowledge of Ridgaway's default and retained him as cashier and paid him a salary, and if the bank after the default had any money or securities in its possession the avails of which might have been applied to the payment of the debt and the bank failed or neglected to hold the securities, or to apply the avails thereof and the money towards the payment of the debt, it could not recover for any money so paid Ridgaway for salary or which might have been so realized from said securities.

The mere fact that the creditor retains the principal in his employment after knowledge of a default will not discharge the surety from an antecedent liability. *Pittsburg, Fort Wayne and Chicago Railway Co. vs. Shaeffer,* 59 *Pa. St.*, 356.

In the ordinary dealings between a bank and its customer, when the latter has money standing to his credit

on deposit in the bank, and the bank holds his independent promissory note upon which there are sureties, if the bank upon the maturity of the note honors the customer's check drawn against that credit instead of applying the credit to the payment of the note, the sureties are not released. The right of the bank to apply the credits of the customer to the satisfaction of such a note is rather in the nature of a set-off or of an application of payments, neither of which, in the absence of express agreement or appropriation, will be required by the law to be so made as to benefit the surety. *Martin vs. Mechanics' Bank of Baltimore,* 6 *H. & J.,* 235; *National Mechanics' Bank vs. Peck,* 127 *Mass.,* 301; *Glazier vs. Douglass,* 32 *Conn.,* 393; *Strong vs. Foster,* 17 *C. B.,* 217. Now Ridgaway stood towards the bank, in this respect, precisely in the situation occupied by a customer. To the latter the bank is a debtor to the extent of the balance to his credit on deposit. To Ridgaway it was a debtor for his salary. Its failure to set off the debt due by it to the customer against the note due by him to it does not release the sureties on that note. Why should its failure to set off the amount of the salary due by it to Ridgaway against the debt due by him to it discharge the sureties on the bond which secures that debt ? We see no reason for any distinction and in our opinion the legal principles applicable to the one case must govern and control the other.

The other proposition stated in prayer six and a half respecting the securities delivered by Ridgaway to it must be considered in connection with the particular facts disclosed by the record and relating to this subject. It appears that on February sixteenth, 1883, Ridgaway took $750.00, of the bank's money and in place of it left his check for that amount to which was pinned as collateral, a certificate of Baltimore and North Carolina Gold Mining Company's stock. This check represented

part of the indebtedness of $8,133, and with the certificate pinned to it was carried as cash by the paying teller until February, 1885. When the device heretofore. spoken of was resorted to by Ridgaway in February, 1885, to get the evidence of his defalcation out of the cash items, the paying teller handed back to Ridgaway the $750.00 check with the certificate of stock still pinned to it. Thus Ridgaway first embezzled the money, and then by means of fictitious entries abstracted the stock which he had previously pledged to the bank. How the failure of the bank to realize anything out of this stock, under these circumstances, can affect its rights or alter the responsibility of Ridgaway's sureties, we are utterly unable to see. Ridgaway's fraudulent conduct prevented the bank from realizing on the collateral, and surely this additional breach of duty on his part can furnish no exoneration to his sureties. When the creditor parts with a security upon which he has a lien for the payment of the principal's debt and to which the surety has a right of subrogation on paying the debt, he impairs his claim against the surety. But that doctrine has no application to a case where the principal has himself fraudulently abstracted the very collateral which he had previously pledged.

The only other security ever held by the bank of Ridgaway's debt was a certificate for shares in the Baltimore and North Carolina Gold and Copper Mining Company delivered by Ridgaway to Mr. Hooper, the new president, and these shares the bank still holds, and the sureties will be entitled thereto upon payment by them of the amount due by Ridgaway.

The prayer marked five and a half needs no special comment, as what we have said in disposing of the fifth, sixth, and sixth and a half prayers is sufficient to show that the Superior Court was right in rejecting it.

The eighth and ninth prayers of the appellants asked the Court to exclude from the consideration of the jury

the admissions of Ridgaway as to his indebtedness to the bank. These admissions were competent though not conclusive evidence against the sureties. *State, use of Clarke vs. McKee,* 11 *G. & J.,* 378; *Ruby and Longnecker vs. State, use of Vernay,* 55 *Md.,* 484.

The third prayer of the appellants was abandoned.

The second prayer of the appellants was erroneous because it was founded on the theory that the President of the bank could lawfully loan the bank's money to an officer of the bank, despite the emphatic provision to the contrary in the charter. *Engler vs. People's Fire Ins. Co. of Balto.,* 46 *Md.,* 322.

The only remaining question arises under the first, fourth and fifth prayers of the appellee. And that question is, was the Superior Court right in instructing the jury to allow interest on each of the items making up the total defalcation of Ridgaway, from the respective dates of those items? Generally speaking, the rule is that interest should be left to the discretion of the jury; but this rule is not without exceptions, and amongst its exceptions are cases on bonds or on contracts to pay money on a day certain, and cases where the money has been used. *Fridge vs. State, use of Kirk,* 3 *G. & J.,* 117; *Gott vs. State, use of Barnard,* 44 *Md.,* 339; *Comegys vs. State use of Dyckes,* 10 *G. & J.,* 186. Ridgaway improperly and unlawfully took and applied to his own use, the money of the bank, and his obvious duty is to put the bank in the precise position it would have occupied had the money not been taken and retained by him. As between him and the bank the duty on his part to pay interest on each sum he embezzled from the time of embezzlement was as positive as the duty to repay the money itself. The whole sum and the interest on each item make up the true measure of damages against him for wrongfully taking and detaining or using the money of the bank. The extent of his liability fixes the extent

of the responsibility of his sureties whenever the latter are answerable for him. *Gott vs. State,* 44 *Md., supra.*

Finding no errors in the rulings excepted to, the judgment will be affirmed, but the appellee will be required to pay the costs occasioned by the printing in the record of the opinion of the Judge of the Superior Court, as that opinion properly forms no part of the record.

> *Judgment affirmed,*
> *with costs.*

(Decided 14th November, 1890.)