**FIDELITY & DEPOSIT CO. OF MARYLAND v. PEOPLE'S BANK OF SANFORD et al.**

**No. 3600.**

Circuit Court of Appeals, Fourth Circuit.

Oct. 2, 1934.

934

Julius C. Smith, of Greensboro, N. C., and I. C. Wright, of Wilmington, N. C. (J. C. Pittman, of Sanford, N. C., on the brief), for appellant.

K. R. Hoyle and Clauson L. Williams, both of Sanford, N. C. (E. L. Gavin, of Sanford, N. C., on the brief), for appellees.

Before PARKER and SOPER, Circuit Judges, and MEEKINS, District Judge.

PARKER, Circuit Judge.

This is an appeal from a decree entered in favor of plaintiffs on a bond guaranteeing the fidelity of the cashier of a bank. Suit was originally instituted on the bond by the bank itself; but later the administration of the bank's affairs was taken over by the commissioner of banks of the state of North Carolina, and he was made a party plaintiff by order of court. Although the case is essentially one at law, it was heard in equity by the court below, without objection from appellant, and was brought here by appeal in equity. We review it, therefore, as though it were an equity cause. Twist v. Prairie Oil & Gas Co., 274 U. S. 684, 692, 47 S. Ct. 755, 71 L. Ed. 1297; Fidelity-Phenix Fire Ins. Co. v. Benedict Coal Corp. (C. C. A. 4th) 64 F.(2d) 347, 348. This does not mean, however, that we will hear the case de novo, or will assume the function of auditors with respect to the voluminous books and records which have been certified to the court, but that we will review it as we do any other equity case under the rule that the findings of fact of the trial judge will not be reversed unless clearly wrong. Fidelity-Phenix Fire Ins. Co. v. Benedict Coal Corp., supra; U. S. Industrial Chemical Co. v. Theroz Co. (C. C. A. 4th) 25 F.(2d) 387; New York Life Ins. Co. v. Simons (C. C. A. 1st) 60 F.(2d) 30.

The original plaintiff in the cause was the People's Bank of Sanford, a small bank with a capital stock of $25,000 at Sanford, N. C. It was organized in 1919 with one H. C. Newbold as cashier; and from the time of its organization until its doors were closed on April 7, 1930, he was in charge of its affairs and had the complete trust and confidence of its other officers and directors, as well as of the public at large. For a number of years prior to 1927, he had given bond in the sum of $25,000 for the faithful discharge of his duties, with the Ætna Casualty Company as surety; but when the time came to renew the bond in 1927, an insurance and real estate company which he owned and controlled, and which represented the Fidelity & Deposit Company of Maryland, had that company execute the bond. This bond, which is the one sued on, was in the sum of $25,000 and was issued September 23, 1927, as of September 16th. It undertook to indemnify the bank against any loss which it might sustain "in respect of any moneys, funds, securities or other personal property of the Employer, or for which the Employer may be responsible, through any act of fraud, dishonesty, larceny, theft, embezzlement, forgery, misappropriation, wrongful abstraction or misapplication, or any other dishonest or criminal act or omission committed by Henry Clay Newbold (hereinafter called the Employee), acting alone or in collusion with others, while in any position in the continuous employ of the Employer, after 12 o'clock, noon, of the 16th day of September, 1927, but before the Employer shall become aware of any default on the part of the employee, and discovered before the expiration of three years from the termination of such employment or cancellation of this bond, whichever may first happen." It required that claims for loss thereunder should be itemized, with full particulars "including the amount and date of each item." And it contained the following provision, which becomes significant in view of one of the contentions of defendant, viz.: "No preliminary application by the Employer for this bond is necessary. This contract incorporates the entire agreement between the Surety and Employer, and no statement of facts in any application or other outside writing which might be claimed to be the inducement for making this bond shall be allowed in any way to affect its validity."

There was no suspicion of any defalcation on the part of Newbold until the evening of April 5, 1930, when a committee of the directors was to prepare a financial statement of the bank's affairs pursuant to a call for such statement by the state corporation commission. At this time Newbold notified the committee that it was unnecessary to examine the bank's affairs, as he was short $48,000 and had put in his unsecured note to cover the shortage. Upon further questioning he admitted that he had taken the money embraced in the shortage, but refused to disclose the manner in which it had been taken or what had been done with it. An examination of the bank's records disclosed that he had discounted unsecured notes signed by himself for $10,000 on March 17th, $10,000 on March 21st, $8,000 on March 24th, and $5,500 on April 2d, and that he had taken all of these notes out of the bank on April

5th, together with a note of his brother, indorsed by him, in the sum of $4,000, and on that date had put in the bank his note of $44,480 in order to make the books balance. The bank was thereupon closed and placed in the hands of the state corporation commission; but, upon the directors executing a note for the amount necessary to make it solvent, it was allowed to reopen. On September 15, 1930, in a suit charging embezzlement and fraudulent misapplication of funds on or about April 5, 1930, it obtained judgment against Newbold for the sum of $44,480; and shortly thereafter Newbold was tried in a criminal action and sentenced to a term in the state penitentiary.

The bank duly filed with defendant a proof of claim under the bond, setting forth the shortage of defendant as above narrated and certain false entries discovered upon the examination of the books; and, on October 17, 1930, it filed suit on the bond against defendant, alleging in general terms embezzlement and misappropriation of funds by Newbold during the term of the bond of the sum of $44,480, pleading the judgment theretofore obtained against Newbold on account of the embezzlement, and attaching as an exhibit to its complaint copy of the proof of claim filed with the defendant. Thereafter it filed an amendment to the complaint, setting up the report of an auditor which pointed out various items running over a period of years as representing embezzlements or misapplications of funds by Newbold. This was filed, not in lieu of the original complaint, but "as an addition to and in supplement and amplification of the matters set out in the original claim as filed with the defendant" and with a prayer that "plaintiff recover of the defendant upon the same, as a portion of its claim." Defendant filed an answer which challenged the right of plaintiff to maintain the suit and denied that plaintiff had sustained any loss during the term of the bond. As an additional defense, the answer pleaded that plaintiff's officers, having had notice of shortages and misapplications on the part of Newbold prior to the execution of the bond, did not disclose to defendant the facts with regard thereto, and asked that the bond be declared void for this reason.

The case was referred by the judge below to a special master, who took voluminous testimony, covering transactions of the bank from the time of its organization, and made a report sustaining the validity of the bond, but holding that defendant was liable thereunder only with respect to an unauthorized loan made by Newbold on November 10, 1929, and the shortage on April 5, 1930, represented by the difference between the $44,480 note and the aggregate amount of the notes simultaneously withdrawn from the bank. Both sides filed exceptions to the report and the case was fully heard by the District Judge, who set aside the report and findings of the special master and made new findings in accordance with his view of what the evidence established. These findings covered the facts heretofore narrated. And there were specific findings to the effect that the bank was not aware of any fraudulent or dishonest act on the part of Newbold prior to the execution of the bond and first acquired knowledge of his fraudulent acts on April 5, 1930; that the circumstances surrounding a loan to his brother in 1921, which was the matter chiefly relied on as proof of knowledge by the officers of the bank of default on his part prior to the execution of the bond, were not such as to cause the officers to think that he was guilty of any wrong and that they were guilty of no wrong in failing to disclose this matter to the defendant when the bond was executed; that during the period of the bond the bank sustained a loss as a result of Newbold's embezzlement and wrongful misapplication of the bank's funds in an amount far in excess of the $25,000 penalty of the bond; and that his fraudulent conduct in falsifying the books of the bank had prevented its officers discovering the losses which it had sustained. The thirteenth finding, which is of particular importance, was as follows:

"From December 31, 1929, to April 5, 1930, the bank's assets were depleted as follows:

| | |
|---|---:|
| Loans collected over and above loans made | $23,812.42 |
| Liberty bonds | 500.00 |
| Cash | 128.00 |
| Cash items | 12,744.23 |
| Shortage in cash | 7,608.19 |
| Total | $44,824.19 |

"Crediting these items with $4,000.00 since collected on the H. L. Newbold note leaves $40,824.19. These items, coupled with Newbold's admission that he took the bank's money, when considered in connection with his several notes, convince me that more than $25,000.00 was taken by him from the bank between these two dates. The defendant's evidence fails to overcome the presumptions which naturally arise from the foregoing facts."

Upon these findings the court held that the suit was properly maintainable by plaintiffs; that there was no valid ground for the rescission or cancellation of the bond; that the execution of the note to the bank by the directors, which made good the shortage of Newbold, did not extinguish the liability of the defendant thereunder; and that plaintiffs were entitled to judgment for the full penalty of $25,000. On this appeal defendant makes four principal contentions: (1) That the suit cannot be maintained by the bank, because it was without authority to sue subsequent to being taken over by the corporation commission, and that it cannot be maintained by the commissioner of banks because he was not made a party until after the right to sue had been barred under the one year provision of the bond; (2) that there is no right to recover under the bond, (a) because the officers of the bank had knowledge of prior defaults of Newbold before the losses complained of, and (b) because the giving of the note by the directors reimbursed the bank for the loss which it had sustained; (3) that the finding of the trial judge as to loss under the bond is not supported by the evidence and is not in accordance with the allegations in the pleadings; and (4) that there was error in the admission of certain testimony, particularly with reference to admissions made by Newbold and the record of the suit in which judgment was obtained against him. We shall consider these contentions in the order named.

## 1. The Right of Plaintiffs to Maintain the Suit.

As heretofore stated, this action was instituted in October, 1930; and there can be no question but that at that time the plaintiff bank had the right to maintain it. The state corporation commission had taken charge of its affairs on April 7th; but in May the directors had executed to the bank the note heretofore mentioned for the purpose of securing its losses, a plan for reopening had been agreed upon with depositors, and on May 31st the corporation commission had entered an order restoring the bank to the control of its stockholders and directors, subject only to certain enumerated conditions which were to be observed in conducting its affairs. Shortly thereafter, upon the sale of a large part of its assets to another institution, the corporation commission had entered an order of June 11, 1930, amending the order of May 31st by forbidding the bank to receive deposits or its stockholders to transfer their stock, but still leaving the af-

fairs of the bank in the hands of the stockholders and directors. These orders seem to be in thorough accord with the statutes of North Carolina. See Code of 1927, § 218c, as amended by Pub. Acts 1931, c. 243, § 5. But, whether authorized by statute or not, certainly their effect was to restore to the bank its assets which had been in the hands of the commission. It had not been dissolved or placed in receivership, and was in full possession of its corporate powers, except as limited by the orders of the commission. It is clear that it could institute in the courts any proper action to recover on the obligations which it held, including the bond given by defendant for the fidelity of its cashier.

After May 31, 1930, the affairs of the bank were not again taken over by the banking department of the state until November 22, 1932, when the commissioner of banks issued a notice of possession on the ground that on that day operations by the bank had been voluntarily suspended. The suit of the bank against the defendant was then pending before the judge below on exceptions to the report of the master; and the commissioner of banks, as successor in interest to the bank in the subject-matter of the suit, was duly made a party thereto, adopting the pleadings which had been filed in its behalf. This was in accordance with the provisions of the statutes of North Carolina, which expressly provided for making the commissioner of banks a party to such action (N. C. Code of 1927, § 218c (3), as amended by Pub. Acts of 1931, c. 243, § 5); and it is clear that, when he was made a party, he succeeded to the rights of the bank in the litigation pending and came into the pending case for the purpose of protecting the rights of creditors in the recovery, not for the purpose of asserting a new and independent cause of action. This is sufficient answer to the contention that he is precluded from recovery by the clause of the bond limiting suit thereon to one year.

## 2. The Right to Recover Under the Bond.

The principal contention of defendant with respect to the right to recover under the bond is that prior to the execution thereof the officers of the bank knew of an improper loan in the sum of $6,500 made by Newbold in the year 1921 on a note of his brother indorsed by himself; that the making of this loan constituted a dishonest act or default on the part of Newbold; and that knowledge thereof on the part of the officers precluded recovery under the bond. A careful examination of the record convinces us, however, that the transaction complained of was

no such dishonest act or default as the bond contemplated. While it appears that the loan when made had not been authorized by the directors, it was approved by them at their next meeting; and there is nothing to show that it was considered by Newbold, or by them, as a dishonest act or as a default on his part. As was said by the learned judge (4 F. Supp. 379, 380) below in dealing with the matter:

"The directors later approved it, and repeatedly approved the renewals. It was reduced until the balance was $4,000, when H. C. Newbold took it out of the bank immediately before his discharge, and the note has been fully paid since this action was commenced. The transaction at the inception was at least a technical violation of the banking law of the state, but it does not appear that he intended to injure the bank in any way. Evidently the officers of the bank believed the note was good; that his intentions were free from wrong, for they retained him and trusted him without question from that time until April 5, 1930.

"The defendant would have the worst construction put on that transaction and conclude therefrom that the cashier was dishonest and unworthy of confidence or trust; that the bank had actual knowledge thereof, and fraudulently withheld the information from the innocent surety, which amounted to a fraud on it, warranting the court in canceling the bond. It is unreasonable to conclude that the bank would have retained him as cashier from 1921 to 1927 and clothed him with the full control of the bank if it thought he was unworthy of trust. The facts not only do not raise the presumption that the bank had such knowledge and belief, but conclusively create the contrary presumption."

In view of our conclusion that the Newbold loan was no such dishonest act or default as the bond contemplated, we need not consider whether the words, "before the employer shall become aware of any default on the part of the employee," should be construed so as to invalidate the bond at the time of its issuance if the employer had knowledge of any dishonest act or default of the employee at that time, nor whether failure of the employer to disclose such dishonest act or default would constitute fraudulent concealment which would avoid it under the peculiar circumstances here presented. See, however, Magee v. Manhattan Life Ins. Co., 92 U. S. 93, 100, 23 L. Ed. 699; Clark v. Manufacturers' Ins. Co., 8 How. 235, 249, 12 L. Ed. 1061; Citizens' Trust & Guaranty Co. v. Globe & Rutgers Fire Ins. Co. (C.

C. A. 4th) 229 F. 326, 330; Supreme Council Catholic K. of A. v. Fidelity & Casualty Co. (C. C. A. 6th) 63 F. 48, 57; General Reinsurance Corporation v. Southern Surety Co. (C. C. A. 8th) 27 F.(2d) 265, 273; 32 C. J. 1272; 14 R. C. L. 1024; Cooley's Briefs on Insurance (2d Ed.) vol. 5, p. 3899; 40 A. L. R. at page 1039, note, et seq. And compare Stipcich v. Metropolitan L. Ins. Co., 277 U. S. 311, 48 S. Ct. 512, 72 L. Ed. 895; National Bank of Asheville v. Fidelity & Casualty Co. (C. C. A. 4th) 89 F. 819, 825, 826; U. S. F. & G. Co. v. Commercial National Bank (C. C. A. 5th) 62 F.(2d) 718, 719; Hare & Chase v. National Surety Co. (C. C. A. 2d) 60 F.(2d) 909, 911; American Surety Co. v. Shaw (C. C. A. 5th) 54 F.(2d) 550, 551.

Other contentions of the defendant with respect to liability on the bond require but scant notice. It is contended that certain notes carried by the bank were not genuine. The evidence as to this is conflicting; but if the defendant's contention with regard thereto be accepted as true, it does not follow that default on the part of Newbold with respect thereto is established or that the other officers of the bank had knowledge of his default. It is argued that Newbold had knowledge of his own defaults and that the bank is chargeable with his knowledge as it left to him the procurement of the bond. The answer to this, of course, is that, "while the knowledge of an agent is ordinarily to be imputed to the principal, it would appear now to be well established that there is an exception to the construction or imputation of notice from the agent to the principal in case of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy; as where the communication of such a fact would necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating." Innerarity v. Merchants' Nat. Bank, 139 Mass. 332, 333, 1 N. E. 282, 283, 52 Am. Rep. 710; American Surety Co. v. Pauly, 170 U. S. 133, 156 et seq., 18 S. Ct. 552, 42 L. Ed. 977.

Nor is there any merit in the contention that defendant's liability under the bond was discharged by the note executed by the directors. This note was given to the bank by the directors in order to make the bank solvent that it might be allowed to reopen, not as a repayment of the amount embezzled by Newbold; and it appears that the bank agreed to hold the note of Newbold and the bond of defendant as collateral to the note. This certainly did not extinguish the bond of

defendant or deprive plaintiff of the right to recover thereon. What effect a recovery on the bond may have on the right of recovery on the note, or how the rights and liabilities of the signers of the note will be affected thereby, are questions which we need not consider, as they are not presented by the appeal.

### 3. The Sufficiency of the Evidence.

■ The question which has caused us the greatest concern is whether the evidence is sufficient to establish that the bank's loss occurred during the period covered by the bond, or whether it merely shows a falsification of the books during that period to cover a loss which occurred prior thereto. Of course, a falsification of the books might in itself be a cause of loss if it prevented recovery on a prior bond; and it is to be noted that the bond covers not merely loss arising from embezzlement but also from "any other dishonest or criminal act or omission." A careful examination of the record convinces us, however, that the evidence sufficiently establishes loss from embezzlement or misapplication to an amount in excess of the penalty of the bond between December 31, 1929, and April 5, 1930. It appears that Newbold placed his unsecured notes in the bank for $10,000 on March 17th, $10,000 on March 21st, $8,000 on March 24th, and $5,500 on April 2d. These notes of themselves are not evidence of embezzlement; but they become such evidence when considered with the further fact that, after they were placed among the assets, the cashier's daily balance sheet and the general ledger of the bank balanced for the days in question, thus showing that assets of the bank must have been withdrawn to the amount of the notes. It is argued that the cashier may have made entries increasing the bank's liabilities to offset the entries showing the notes as assets; but the evidence offered in support of this theory is entirely unsatisfactory, and it would seem that the efforts of defaulters in falsifying books would be to decrease rather than increase the showing as to liabilities. Not only were notes aggregating $33,500 placed among the assets of the bank, as above stated, but it also appears that, when they, with the $4,000 note of H. L. Newbold, were withdrawn on April 5th, a note of $44,480 was substituted to balance the books, showing that there was an additional shortage of $6,980. The bank got back the $4,000 note and sustained no loss on account thereof; but it did sustain loss as to the remaining $40,480 shortage which these notes were used to cover up. Newbold said at the time of the discovery of the shortage that he had got the money;

and, although he attended the hearing before the special master at the instance of defendant and was repeatedly in conference with defendant's auditor and attorneys, he was not put on the stand to give any other explanation of the shortage or to substantiate defendant's theory that the notes were placed among assets to balance a manipulation of the books which increased liabilities.

There are other circumstances which support the conclusion of the judge below as to the embezzlement of Newbold. The affairs of the bank were regularly examined by the state corporation commission and the reports of the examiner are in evidence showing that as late as June, 1929, there was nothing in connection with the bank's books and records to show that such a shortage existed. Its officers examined its affairs carefully on December 30, 1929, for the purpose of making a report to the corporation commission, and found its books in balance and no evidence of anything wrong. The books show that, excluding from consideration the notes of Newbold, the bank discounted between December 31, 1929, and April 5, 1930, notes to the amount of only $73,254.92, whereas it collected on notes paid the sum of $97,568.02, thus showing during this period an excess of collections over loans of $24,313.10. Nevertheless the liabilities of the bank during this period were not decreased but increased from $316,419.55 to $328,146.68. With liabilities increasing and assets other than loans and discounts remaining at approximately the same level, there is no explanation of what became of the proceeds of collections mirrored in the shrinkage in loans and discounts except the simple explanation given by Newbold that he had taken the money. We are satisfied from a careful examination of the record that we would not be justified in reversing the findings of the judge to the effect that there was embezzlement by Newbold during the period covered by the bond of an amount far in excess of its penalty.

■ Nor do we think that reversal is justified because of failure to establish the items set forth in the copy of auditor's report attached to the amendment to the complaint. While that audit purported to show items embracing the entire loss sustained during the period of the bond, the amendment to the complaint expressly stated that it was filed "as an addition to and in supplement and amplification of the matters as set out in the original claim," and prayed that plaintiff might recover thereon "as a portion of its claim." It was clearly not intended as a substitute for the original pleading and should not be held to have superseded same. 49 C. J. 559; Na-

tional Savings & Trust Co. v. Ryan, 49 App. D. C. 159, 262 F. 613; Threadgill v. Com'rs, 116 N. C. 616, 21 S. E. 425. The original claim, copy of which was attached to the complaint, set forth the embezzlement as connected with the notes of March 17th, 21st, and 29th and April 2d and 5th; and where the proof sustained the embezzlement as thus claimed in the original complaint, we do not think that plaintiff should be denied judgment because of failure to establish the specific items set forth in the auditor's report attached to the amendment. On the contrary, where the facts were fully developed as they were here, the court should have permitted amendment to conform the pleadings to the proofs, if it had interpreted the pleadings as restricting the issues to the items set forth in the auditor's report. R. S. § 954, 28 USCA § 777. The purpose of a trial is the ascertainment of truth in order that justice may be done; and technical rules of pleading should not be allowed to stand in the way of the accomplishment of that purpose.

It is true that the bond requires that claims for loss shall be itemized with full particulars "including the amount and date of each item"; but this is to be construed reasonably and is complied with when the company is furnished, as was the case here, with all the facts surrounding a loss which the employer has it in his power to give. Maryland Casualty Co. v. First Nat. Bank (C. C. A. 5th) 246 F. 893, 901. Embezzlers ordinarily operate secretly, and a surety may not escape liability under a bond such as this because the employer is unable to show the exact time and manner of the embezzlement. Not only did the bank give the company in its proof of claim a full statement of all the facts known to it, but it also gave the company full access to its books and records and afforded the auditor of the company full opportunity to examine and audit them. We think that the proof furnished, copy of which was attached to the complaint, sufficiently set forth the loss as established by the finding of the District Judge; but, even if this were not true, it is well settled that a claimant is not bound by the proofs of loss furnished under the bond or policy. Fidelity-Phenix Fire Ins. Co. v. Benedict Coal Corporation (C. C. A. 4th) 64 F.(2d) 347, 354; First Nat. Bk. of Wagener, S. C., v. Glens Falls Ins. Co. (C. C. A. 4th) 27 F.(2d) 64, 70. As said by us in the case last cited:

"The proofs of loss are not part of the contract of insurance. The contract requires them to be made, but when made they are the mere declarations of the insured, admissible in evidence as such, but not conclusive of the facts which they state. If they contain false statements, upon which the company relies, and so acts or refrains from acting that injury would result therefrom if the statements were denied, an estoppel in pais may arise. 26 C. J. 381, and cases cited. But no such estoppel arises in ordinary cases of erroneous statements in proofs of loss, where the company is not induced thereby to admit a liability which it would not have admitted or otherwise misled into changing its position."

### 4. The Evidentiary Questions.

The exceptions relating to the admission of evidence require little discussion. The judgment against Newbold was properly admitted; for, although not binding on defendant, it constituted prima facie evidence of the breach of conditions of the bond. Dixie Fire Ins. Co. v. American Bonding Co., 162 N. C. 384, 78 S. E. 430; Moses v. United States, 166 U. S. 571, 600, 17 S. Ct. 682, 41 L. Ed. 1119. The testimony as to the admissions of Newbold was proper as a part of the res gestæ; for they were made while he was still employed by the bank and in explanation of the state of its accounts, which were being examined by its officers and directors. U. S. v. Gaussen, 19 Wall. 198, 213, 22 L. Ed. 41; Fidelity & Deposit Co. v. U. S. (C. C. A. 4th) 55 F.(2d) 100, 104; Guarantee Co. of N. A. v. Phenix Ins. Co. (C. C. A. 8th) 124 F. 170, 174; McShane v. Howard Bank, 73 Md. 135, 20 A. 776, 10 L. R. A. 552; Bank of Brighton v. Smith, 12 Allen (Mass.) 243, 90 Am. Dec. 144; Dixie Fire Ins. Co. v. American Bonding Co., supra; St. Charles Savings Bank v. Denker, 275 Mo. 607, 205 S. W. 208; Indemnity Ins. Co. v. Krone, 177 Ark. 953, 9 S.W.(2d) 33, 60 A. L. R. 1493; note 60 A. L. R. at page 1522 et seq.

The testimony of the witness Gavin that the notes of Newbold covered the shortage between December 31, 1929, and April 5, 1930, was a mere conclusion as to a matter shown by the books themselves, which were in evidence; and the same is true as to his testimony which was stricken out on page 199 of the record. The testimony of the witness Schisler, which was stricken, related to statements of plaintiff's auditor Coursey and, in so far as it was competent, it was in evidence in the report of Coursey. The defendant suffered no prejudice, therefore, in the rulings as to any of these matters.

But if we exclude from consideration all testimony admitted over objection and consider all of that which was stricken, our

conclusion on the facts would not be different from that which we have expressed, which is fully sustained by the other testimony. As was said by the Circuit Court of Appeals of the Ninth Circuit in Migeon v. Montana Cent. R. Co., 77 F. 249, 251: "In the consideration of such specifications of error the general rule is that, in equity suits tried before the judge without a jury, the appellate court ought not to reverse the case merely upon the ground that the judge received irrelevant testimony, or that he rejected testimony that was admissible, where, upon all the facts and circumstances of the case, it is clearly apparent that the result would not have been different if the testimony objected to had been rejected in the one case or received in the other. Merchants' Nat. Bank v. Greenhood, 16 Mont. 395, 41 P. 250, 251, 267, and authorities there cited; Scroggin v. Johnston, 45 Neb. 714, 64 N. W. 236, 238, and authorities there cited; Holmes v. State, 108 Ala. 24, 18 So. 529. The controlling inquiry in such cases is whether there is sufficient competent evidence in the record to sustain the decree. Grayson v. Lynch, 163 U. S. 468, 476, 16 S. Ct. 1064, 1067 [41 L. Ed. 230]." See, also, Mammoth Mining Co. v. Salt Lake Foundry & Machine Co., 151 U. S. 447, 14 S. Ct. 384, 38 L. Ed. 229; Howells State Bank v. Novotny (C. C. A. 8th) 69 F.(2d) 32; Kaffanges v. New York Life Ins. Co. (C. C. A. 1st) 59 F.(2d) 475, 476; Unkle v. Wills (C. C. A. 8th) 281 F. 29, 34; Engelstad v. Dufresne (C. C. A. 9th) 116 F. 582, 589; Oates v. U. S. (C. C. A. 4th) 233 F. 201, 205, and Fanning v. U. S. (C. C. A. 4th) 72 F.(2d) 929.

For the reasons stated, the decree appealed from will be affirmed.

Affirmed.