## SMITH v. AMERICAN NAT. BANK.

(Circuit Court of Appeals, Eighth Circuit. September 12, 1898.)

No. 893.

1. EVIDENCE—NEGOTIATIONS PRECEDING WRITTEN CONTRACT.

The circumstances out of which a written contract arose, and which surrounded its execution, may be shown for the purpose of ascertaining its subject-matter, and the standpoint of the parties in relation to it, but not to vary the contract by addition or substitution.

2. FEDERAL COURTS—SEPARATE JURISDICTION AT LAW AND IN EQUITY.

By the constitution and statutes of the United States the jurisdiction of the federal courts at law and in equity is separate and distinct, the equity jurisdiction being limited, however, to cases where there is not a plain, adequate, and complete remedy at law; and a suitor must proceed in that forum which is appropriate to the case. If the remedy at law is plain, adequate, and complete, whether the right to be enforced is legal or equitable, the defendant has the right to trial by jury, and the action must be at law; while, if the object and nature of the remedy sought are equitable, he has the right to have the case determined by a court of equity, in which he can set up an equitable defense, which he cannot do in an action at law, and of this right he cannot be deprived at the option of the plaintiff.

3. ACTION—LEGAL OR EQUITABLE—GROUNDS OF EQUITABLE JURISDICTION.

A case may be sustained in equity on a legal right if the object and nature of the remedy sought are equitable, or where, though the right may be clear at law, a court of law is not able to afford so complete, adequate, or efficient and practical a remedy as a court of equity.

4. SAME—VIOLATION OF TRUST—FOLLOWING TRUST PROPERTY.

The owner of certain bonds and mortgages delivered them, indorsed in blank by the payee, to a trust company, taking in return a certificate of deposit for a certain sum, and a contract providing that full title to the securities, with full power of disposition, should vest in the trust company, but by which it undertook for itself, its successors and assigns, to judiciously handle the same, and to account to the other party for a share of the proceeds above the amount of the certificate of deposit. The trust company, in violation of this trust, transferred the securities to a bank as collateral security for a past-due indebtedness of its own; the bank, however, having no knowledge of the trust. Held, that the bank took the legal title, and the only interest remaining in the cestui que trust under the contract was an equitable one to enforce the right to the accounting therein provided for against the bank as a transferee without consideration, which interest would not support an action at law against the bank for conversion.

In Error to the Circuit Court of the United States for the Western District of Missouri.

Thomas G. Frost (Albert S. Marley, on the brief), for plaintiff in error.

Sanford B. Ladd (John C. Gage and Charles E. Small, on the brief), for defendant in error.

Before BREWER, Circuit Justice, SANBORN, Circuit Judge, and RINER, District Judge.

RINER, District Judge. This was an action at law, brought by Charles C. Smith, plaintiff in error, against the American National Bank of Kansas City, Mo., defendant in error, to recover damages for the value of certain mortgage coupon bonds and mortgages, alleged to have been wrongfully converted by the defendant bank. It appears from the record that the Kansas Loan & Investment Company, a corporation organized under the laws of the state of Kansas, engaged in the business of loaning money upon bonds secured by mortgages upon real estate in Kansas and elsewhere, having made a number of loans, sold its bonds and mortgages securing the same in the East; that John Kerley, the agent of the company at New Haven, Conn., sold the bonds and mortgages (which were issued at different times from 1886 to 1890) to the plaintiff in error, Charles C. Smith, and to other parties, who lived in the vicinity of New Haven. The bonds were substantially in the form of negotiable promissory notes with interest coupons attached. The greater part of them matured in five years, and bore interest at the rate of 7 per cent. per annum. When sent to Kerley for sale, both the bonds and the mortgages securing the same bore the indorsement or assignment of the Kansas Loan & Investment Company. The indorsement on the bonds was as follows: "For value received, I hereby assign the within bond to ———, without recourse." The indorsement on the mortgages was in the same form. In each case the indorsement was executed by the proper officer of the loan and investment company. The interest, as it matured upon the several bonds and mortgages sold by Kerley to purchasers in the East, was forwarded by the Kansas Loan & Investment Company to Kerley, and by him paid to the purchasers of the bonds and mortgages, the purchaser in each case surrendering to him the coupon representing the interest paid. This method of transacting the business was continued until June, 1892, when the Kansas Loan & Investment Company failed, and a receiver was appointed to take charge of its affairs. Thereupon some of the purchasers of the bonds and mortgages in controversy in this action selected the Union Trust Company, a corporation organized under the laws of the state of Iowa, and having offices at Sioux City, Iowa, Manchester, N. H., and Kansas City, Mo., as their agent for the purpose of collecting interest and looking after their loans generally, by giving them such attention as they might, from time to time, require. The principal office of the Union Trust Company was at Sioux City, Iowa, and its business was that of handling Western mortgages and other securities. E. M. Donaldson was its secretary and its principal managing officer. He had practically the entire supervision and control of its business. John Morse was the agent of the trust company in New Haven. The Union Trust Company continued to collect the interest for the plaintiff in error, and others who had intrusted their business to it, for several months, conducting the business substantially as it had been conducted by the Kansas Loan & Investment Company prior to its failure. In December,

1892, Donaldson, the secretary of the Union Trust Company, went to New Haven for the purpose of negotiating, on behalf of the trust company, a trade for the bonds and mortgages owned by the plaintiff in error and other parties whose bonds and mortgages the Union Trust Company already held for collection, and with others who owned similar securities, which they had purchased from the Kansas Loan & Investment Company. The negotiations between Donaldson, the plaintiff in error, and other owners of bonds and mortgages, resulted in a written contract between the Union Trust Company and certain of the holders of bonds and mortgages purchased from the Kansas Loan & Investment Company for the transfer of their bonds and mortgages to the Union Trust Company. The contracts were all prepared by Donaldson, or under his supervision, after his return to Sioux City, were signed in duplicate by the Union Trust Company, and all forwarded to Morse, the agent of the company, at New Haven, who secured the signatures of the holders of the bonds and mortgages thereto. One copy of the agreement, after being signed, was forwarded to the Union Trust Company, at Sioux City, and the other retained by the other party to the contract. The contracts were printed, blank spaces being left for the insertion of the names and a description of the securities to suit each case. The printed portions of the contract were alike, and, with the exception of the name and a description of the securities, were all in the form of the one entered into between the trust company and the plaintiff in error, as follows:

"No. L. D. 17.

"Whereas, the Union Trust Company of Sioux City has purchased of C. C. Smith the following described securities, to wit: [Here follows a concise description of fifty-seven loans, with the mortgages securing them, aggregating about $59,000], and in full payment therefor has issued its certificate of deposit No. L. D. 17, for thirty-five thousand and no one-hundredths dollars, dated the first day of March, 1893, maturing the first day of March, 1898, bearing interest as evidenced by the coupons thereto attached: Now, this instrument witnesseth that the Union Trust Company of Sioux City will undertake judiciously to handle the securities above enumerated, exercising entire selection as to the manner, method, and time of the procedure, and will, at the maturity of the certificate of deposit above referred to, or prior thereto, at its election, render a true account thereof, and pay over to the legal holder of said certificate one-half of the residue, if any, remaining out of the securities above described, after making deductions from the whole sum realized as follows, to wit:

"First. The face of the certificate of deposit number L. D. 17, above referred to, together with the interest paid thereon.

"Second. All taxes, legal expenses, court costs, or costs of insurance in each of the securities above referred to, or those derived in exchange therefor, or in the investment of funds realized therefrom.

"Third. All costs incurred in improvements, betterments, repairs, additions to, or superintendence of the property which may be derived directly from the securities above enumerated, or indirectly growing out of the exchanges or purchases.

"Fourth. All sums of money, together with the interest thereon at six per cent. per annum, which may be advanced in direct purchase or exchange, wherein such exchange or purchase was made in the interest of or for the benefit of the holder of this certificate, or expended in the payment of taxes, insurance, court costs, or other necessary expenses incurred in improvements, additions, betterments, repairs, or superintendence.

"This agreement shall in no wise affect the fee-simple and indisputable ownership of the Union Trust Company of Sioux City in and to said above-

described securities, or its full right to sell or convey the same, or any properties acquired in lieu thereof, by process of law, negotiation, or purchase. But the obligation of the Union Trust Company of Sioux City to undertake, pursuant to the conditions heretofore recited, to procure a residue to be paid over to the holder of said certificate, shall be binding alike on its successors and assigns.

"In witness whereof, the Union Trust Company of Sioux City has hereunto affixed its official seal and signature this 17th day of January, 1893.

"Executed in duplicate.

"The Union Trust Company of Sioux City,
"By E. M. Donaldson.

"C. C. Smith."

When these contracts were executed, some of the bonds and mortgages were then in the possession of the Union Trust Company for collection. Those which were not delivered prior to the execution of the contracts were, in each case, delivered to Morse, the agent of the Union Trust Company, at the time the contract was signed. None of the bonds or mortgages were assigned by the holders thereof, but, when delivered by them to the trust company, carried the same indorsement in blank as when they were delivered by Kerley to purchasers. At the time the contracts were signed and delivered, Morse, the agent of the trust company, delivered to each of the holders of the bonds the obligation of the trust company, designated a "Certificate of Deposit," for about 60 per cent. of the face value of the bonds. The obligation so executed and delivered to the plaintiff in error was as follows:

Certificate of Deposit.

The Union Trust Company.

Kansas City, Mo., March 1st, 1893.
No. L. D. 17.

Payable in New York Exchange. Not Subject to Check. Will pay to the order of C. C. Smith $35,000.00 (thirty-five thousand and no-100 dollars) on the return of this certificate properly indorsed, with interest at the rate of six per cent. per annum, payable semiannually, as evidenced by 10 interest coupons hereto attached. E. M. Donaldson, Sec.

No interest after maturity.

The first of the interest coupons attached to this instrument is as follows:

The Union Trust Company.

No. 1. At Kansas City, Mo., Sept. 1st, 1893.

Will pay to bearer ten hundred and fifty dollars, being six months' interest on its certificate of deposit numbered L. D. 17, payable in New York exchange if desired. E. M. Donaldson, Sec.

The record further shows that when these bonds and mortgages came into the possession of the Union Trust Company, under the contracts above mentioned, many of them were in default by reason of the nonpayment of either the principal or interest. In some instances foreclosure proceedings had been instituted by the Kansas Loan & Investment Company prior to its failure. In other cases property had been sold for taxes, and tax deeds issued, and, as one witness testified: "The property had depreciated in value to such an extent, and the back taxes had accumulated to that extent, that

they were hardly worth any further expense at all." On the 16th of May, 1893, the Union Trust Company delivered the bonds and real-estate mortgages in controversy in this case to the American National Bank of Kansas City, Mo., as collateral security for a certain indebtedness due from the Union Trust Company to the American National Bank. The indebtedness from the trust company to the bank had become due and payable prior to the delivery to the trust company of the bonds and mortgages in controversy. On the 25th of June, 1893, the Union Trust Company, being insolvent, a receiver was appointed, who, on that day, took charge of its business.

Before bringing this action the plaintiff in error made demand upon the defendant in error for the possession of the bonds and mortgages in controversy, but the defendant refused to deliver the securities, or any of them, to the plaintiff. Thereafter, the plaintiff, on October 19, 1895, brought this action. The record shows that the plaintiff's claim against the defendant is based upon the contracts between the former holders of these securities and the Union Trust Company. It further discloses that the certificates of deposit have never been returned to the Union Trust Company, and that in some instances interest was paid upon them. The petition contains 13 causes of action. The first cause of action relates to bonds and mortgages formerly owned by the plaintiff. The other causes of action relate to securities formerly owned by other parties, who assigned their claims to the plaintiff prior to the commencement of this action. On May 18, 1896, this cause came on for trial before the court and a jury. At the conclusion of the plaintiff's testimony the court directed the jury to return a verdict for the defendant, and a judgment was thereupon entered in its favor for costs. At the trial the plaintiff in error offered parol evidence, which was excluded by the court, of the negotiations had between the parties prior to the execution of this contract. When this testimony was offered in the court below, counsel, in explanation of the grounds upon which the offer was made, said:

"We propose by this evidence as to prior transactions, first, to explain the transaction to which the written contract refers. It refers to something which has preceded. We propose to show what that was. We do not think we will be able to accept the legal constructions which this instrument chooses to put upon prior transactions in the absence of any principle of estoppel which will forbid us to contradict a general recital in an instrument which is not a part of the contract itself. That is the first purpose. The second purpose is this: This instrument, on its face, is incomplete. It is a well-known principle of law in these things that the court, in construing this instrument, is compelled to construe, identify, and interpret certain things which appear here without any explanation; for instance, that certificate of deposit. What does this court know about that certificate of deposit? What was its consideration? What was its purpose? How did it happen to be given? What possible connection could there be between the holder of that certificate of deposit as a cestui que trust and the notes themselves? One of the primary rules, as I apprehend, in construing a legal instrument in writing is to put the court in the position of the parties at the time the contract was entered into, so that the court may know what they were endeavoring to do. So I say that this instrument is incomplete on its face by reference to the certificate of deposit, the origin of which is not explained, the reasons for the giving of which are not set out here; and the consideration itself for that certificate of deposit is, as a matter of fact, not known to the court at the present time."

We do not deem it necessary to discuss this proposition at any length. It is sufficient to say that, after a careful examination of the record, we think the ruling upon the evidence offered at the trial and rejected by the court was correct. The offers, we think, come within the familiar rule that, in the absence of fraud, accident, or mistake, parol evidence of prior negotiations is never admissible for the purpose of contradicting the terms of a written contract. It is true, the circumstances out of which the contract arose, and which surrounded its adoption, may be shown in evidence for the purpose of ascertaining its subject-matter, and the standpoint of the parties in relation to it, but not to vary the contract by addition or substitution. Willard v. Tayloe, 8 Wall. 557; Forsyth v. Kimball, 91 U. S. 291; Bast v. Bank, 101 U. S. 93.

The circuit court seems to have entertained the opinion that the execution and delivery by the plaintiff to the Union Trust Company of the written contract, in connection with the contemporaneous or prior delivery of the securities to it, operated to devest at once and forever the plaintiff's title to the securities, and to vest the same in the Union Trust Company; in other words, that the transaction was, in effect, a sale of the securities to the trust company. In ruling upon the request made by the defendant to instruct the jury to return a verdict in its favor, the court said:

"Now, I confess that, as a lawyer, with a limited experience extending over a period of nearly forty years, with a somewhat varied practice, and some knowledge of commercial law and contracts, if this contract had been presented to me I would not have had any hesitancy in saying that it was a sale of these bonds outright to the Union Trust Company, and I believe that a court, in construing contracts, ought not to undertake to make a contract for sensible and practical men; that its function and its office simply is to apply, construe, and enforce the contract which the parties themselves have made."

As the point is one upon which the opinions of the members of this court are not entirely in accord, we pass from the subject without further remark, because, irrespective of that question, there is a view decisive of the case in regard to which we are unanimous, viz. that the remedy of the plaintiff in error, if any he has, is in equity, and not in law. And this is one of the grounds upon which the learned judge disposed of the case in the court below. In announcing his conclusions, which are set out at length in the record, he said:

"It is rarely that in the course of practice a case presenting the phases this does comes so strongly within the wise and equitable discretion of a chancellor. There are certain rights and equities undoubtedly connected with this case which it would be difficult to administer ex æquo et bono between these parties under the rigid and inflexible rules of the common-law side of the court. Very grave and extremely doubtful questions are presented on the plaintiff's side as to whether there are not certain rights and equities vested in this defendant, which a chancellor alone could properly adjust and properly protect."

Both by the constitution and the legislation of congress, organizing the federal courts and defining their jurisdiction, the distinction between common-law and equity jurisdiction has been explicitly declared, and carefully defined and established. Section 2 of article 3 of the constitution declares that "the judicial power shall extend to

all cases, in law and equity, arising under this constitution, the laws of the United States, and treaties made, or which shall be made under their authority," etc. By section 629 of the Revised Statutes of the United States the circuit courts are given jurisdiction of all suits in equity where the matter in dispute exceeds a certain amount, formerly $500, now $2,000, exclusive of interest and costs. This jurisdiction, however, can only be exercised within the limits prescribed by the organic law conferring this power, and must be confined to the cases and subjects therein defined. Section 723 of the Revised Statutes provides that "suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate, and complete remedy may be had at law." This section, it will be noticed, creates a limitation and exception to the jurisdiction of the court by declaring that the case defined in the section is not a suit in equity cognizable under the power conferred by section 629. Congress undoubtedly had the power to define what should be a case in equity by declaring what the common law was which drew the line between the courts of law and equity, and there can be no doubt that, when so declared, that declaration was obligatory upon the federal courts by superadding the authority of the legislative department of the government to that of the common law, so as not to leave the line of separation discretionary with the judges. The seventh amendment to the constitution provides: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by jury shall be otherwise re-examined in any court of the United States than according to the rules of common law." The effect of this provision is to declare that the right of trial by jury shall depend neither on legislative nor judicial discretion. In the absence of this provision, this right might be impaired (1) by the organization of courts in such manner as not to secure it to suitors; (2) by authorizing courts to exercise, or by their assumption of, equity or admiralty jurisdiction over cases at law. This provision of the constitution, however, preserves the right of jury trial against any infringement by any department of the government, and section 723 prohibits all courts of the United States from sustaining suits in equity where the remedy is complete at law. Taking this section in connection with section 648 of the Revised Statutes, which provides that "a trial on issues of fact in the circuit court shall be by jury except in cases of equity and of admiralty jurisdiction, and except as otherwise provided * * * by the next section" (which provides for a waiver of a jury by the parties), it is perfectly clear that congress, by this legislation, intended to preserve to all litigants a right deemed both valuable and sacred. It will be noticed from an examination of this legislation that to bring a case within the exception mentioned in section 723 of the Revised Statutes, two things must concur: (1) It must be a suit of equity jurisdiction; (2) a suit in which a complete remedy cannot be had at law. If any such remedy could be had at law, then it is a suit at common law within the provisions of the seventh amendment to the constitution. To have this effect, however, as stated by the supreme court in Boyce's Exrs. v. Grundy, 3 Pet. 210, "it is not enough that there is a remedy at law;

it must be plain and adequate, or, in other words, as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity." In Parson v. Bedford, 3 Pet. 433, the supreme court said:

"It is well known that in civil causes in courts of equity and admiralty juries do not intervene, and that courts of equity use the trial by jury only in extraordinary cases to inform the conscience of the court. When, therefore, we find the amendment requires that the right of trial by jury shall be preserved 'in suits at common law,' the natural conclusion is that the distinction was present in the minds of the framers of the amendment. By 'common law' they meant what the constitution denominates in the third article 'law,' not merely suits which the common law recognizes among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered, or where, as in admiralty, a mixture of public law and of maritime law and equity, was often found in the same suit."

Under the foregoing provisions of the constitution and the acts of congress there can be no doubt that, in a case where a court of law is competent to take cognizance of a right, and has power to proceed to a final judgment, which affords a plain, adequate, and complete remedy without the aid of a court of equity, the plaintiff should proceed at law "because the defendant has a constitutional right to trial by jury." Hipp v. Babin, 19 How. 271. If, however, the right is only an equitable one, or, if legal, the remedy is only equitable, or both legal and equitable, partaking of the character of both, and a court of law is unable to afford a remedy, according to its settled method of proceeding, commensurate with the right, the suit for its assertion should be in equity. In determining the relative jurisdiction over actions at law and suits in equity, it becomes necessary, under our judicial system, to consider (1) the subject-matter, (2) the relief, (3) its application, (4) the competency of a court of law to afford it. These are the tests, and their application is not to be regulated by the decisions of the state courts, whose judicial system in many instances is organized on a principle wholly inconsistent with that upon which the federal courts are organized. The courts of the United States are courts of limited jurisdiction, which must be exercised in the mode pointed out by the constitution and acts of congress. They are without power to do away with the distinction between law and equity, the forms used and the causes and reasons which distinguish the one from the other, even if they were so inclined. As stated by Chief Justice Taney in the case of Bennett v. Butterworth, 11 How. 669:

"The constitution of the United States in creating and defining the judicial power of the general government establishes the distinction between law and equity, and a party who claims a legal title must proceed at law, and may undoubtedly proceed according to the forms of practice in such cases in the state courts; but, if the claim be an equitable one, he must proceed according to the rules which this court has prescribed regulating proceedings in equity in the courts of the United States."

Under the federal system the circuit court is vested with the jurisdiction both of a court of common law and a court of equity, but congress has placed a limitation upon its equity powers by prohibit-

ing their exercise in any case where the legal remedy is plain, adequate, and complete. Under this system the defendant is entitled (1) to a jury trial on an issue of fact in a suit at common law; (2) to have his rights determined in a court of equity in a case where the remedy at law is not complete, and of this right he cannot be deprived at the option of the plaintiff. By the organization of the circuit court one tribunal is provided competent to give a remedy for every wrong, and a party should in all cases be compelled to resort to that which is appropriate to his case, and ask his remedy with the inci-· dents attached to it. The rights and rules of property are the same at law as in equity. The remedy, however, for their violation is different, and a case may be sustained in equity on a legal right if the object and nature of the remedy sought is equitable. There may be cases, too, where the right may be clear at law, but as a court of law cannot, by assuming cognizance of the conscience, act on the person of a party, it is not able to afford a complete remedy. If the remedy is doubtful, difficult, not adequate to the object, not so complete as in equity, not so efficient and practicable to the ends of justice and its prompt administration, the case would come within the exception mentioned in section 723.

The plaintiff in error admits the general doctrine that the administration of trust estates is within the peculiar province of a court of equity. He insists, however, that an entirely new feature of the case is presented when there has been a diversion of trust funds by the wrongful act of the trustee and an action is brought by the cestui que trust against the third party who has participated with the trustee in such diversion, and that he can maintain an action at law for the reasons (1) that in such a case the court will attribute the ownership and legal title of the converted property to the cestui que trust, and (2) upon the theory that the conveyance or disposition of the trust property in violation of the trust operates as a repudiation or abandonment of the trust pro tanto. Our attention has been called to a number of cases from the state courts wherein equitable rights, which were once only recognized and enforced in courts of equity, have been recognized by courts of law. Many of these cases are from states where the distinction between actions at law and suits in equity has been abolished, and where, under the state practice, a defendant may, in an action at law, set up an equitable defense,—a thing which he cannot do in the federal court. Some decisions of the supreme court of the United States, however, are cited in support of the doctrine contended for, and these we will briefly notice. The case of Oliver v. Piatt, 3 How. *401, was a case in equity, and it was there held that where a trustee had been guilty of a breach of trust, and had transferred the property by sale or otherwise, the cestui que trust had the right to follow the property in the hands of a third person, "unless," said the court, "the latter stands in the predicament of a bona fide purchaser for a valuable consideration, without notice." In May v. Le Claire, 11 Wall. 235, which was also an equity case, the court held that, where a trustee had abused his trust, the cestui que trust had the option to take the original or the substituted property, and, if either has passed into the hands of a bona fide purchaser with-

out notice, then its value in money.    In Kitchen v. Bedford, 13 Wall. 413, the supreme court sustained an action at law for the conversion of a number of bonds issued by a railroad company, which had been placed in the hands of one Rayburn, as trustee under a contract, for the purpose of purchasing certain lands from the railroad company for the owner of the bonds, but, instead of purchasing the lands, the trustee sold the bonds to another party, who, in turn, sold them to a third party, both purchasers knowing the purpose for which the trustee held the bonds; and Mr. Justice Bradley, in disposing of the case, said:

"Instead of doing this, as he was bound, he sold them to Bedford for six cents on the dollar.    Bedford sold them to Webber at one hundred and fifty per cent. advance, both knowing the object for which Rayburn held the bonds. A clearer case of fraudulent breach of trust it is difficult to conceive, and the defendants being particeps criminis, were bound to deliver the bonds and coupons to the plaintiff when he demanded them."

In the case of U. S. v. State Bank, 96 U. S. 30, which was an action to recover from the United States gold coin upon certain gold certificates deposited in the subtreasury at Boston, and which had been canceled and forwarded to the treasurer of the United States at Washington, the certificates having been obtained by one Hartwell, the cashier of the subtreasury at Boston, by virtue of a contract in the name of the United States, which contract was a part of a scheme of the cashier to appropriate to his own use the money after its receipt, and to give a fraudulent voucher therefor, the court said: "The interposition of equity is not necessary where a trust fund is perverted.    The cestui que trust can follow it at law as far as it can be traced;" but this declaration must be taken in connection with the following proposition announced in the case: "The finding of the court shows clearly that Hartwell knew, when he received the certificates, that they did not belong to Mellin, Ward & Co., and that they did belong to the State Bank, represented by Smith as its agent. Hartwell was privy to the entire fraud from the beginning to the end, and was a participant in its consummation."    In all of the cases where an action at law has been sustained by the supreme court, the third party had full knowledge of the trust relation existing between the trustee and the cestui que trust, and was a party to the fraud.

This case, however, is clearly distinguishable in its facts from the cases cited.    There is no evidence in this record tending to show that the bank had any notice or knowledge whatever, by an indorsement or assignment upon the bonds or otherwise, of the existence of any contract between the original holders of the securities, or between Smith and the Union Trust Company, or that it had information of the existence of any contract relation between the plaintiff and the trust company, sufficient to put a reasonably prudent man upon inquiry.    The Kansas Loan & Investment Company, the payee, assigned the bonds and mortgage to Kerley.    Kerley assigned them in blank, and delivered them to the purchasers, and without further or other indorsements they passed into the hands of the trust company.

The record further shows that at the time the bonds came into the possession of the trust company, and when they were delivered by

it to the bank, some of them were due and others not due. It was under these conditions that the American National Bank took the securities, and plaintiff now brings this action for their conversion, placing his damages at the face value of the bonds turned over to the bank by the trust company. The agreement between the plaintiff in error and the Union Trust Company vested the title to the securities described therein in the Union Trust Company, its successors and assigns, in trust to collect or to sell and dispose of the same for their fair value in order to secure and pay (1) the expenses of the trust, and (2) the certificate for $35,000 and interest. A bona fide sale of the securities by the Union Trust Company for their fair value to an innocent purchaser would, doubtless, have vested the title in him absolutely. And if a sale had been immediately made by the trust company for $40,000, this sum would have been held in trust to pay the expenses of the administration of the trust and the certificate of indebtedness for $35,000. If no disposition had been made of the securities during the five years, they must, we think, have been declared to have been held in trust for these purposes, and upon a suitable application would have been sold by any court to effect them. The provisions in the agreement for the judicious handling of the securities, for the application of the proceeds, for the accounting, and that clause at its close, which, after providing that the trust company holds the title to the securities, declares that its obligation, pursuant to the conditions of the agreement, to procure a residue to be paid to the holders of the certificate, shall nevertheless be binding upon the company and its successors and assigns, seems to us to lead inevitably to this conclusion. If this is a correct construction of the contract, while a purchaser of these securities from the trust company for value would have taken a good title, a successor or assignee of the trust company, who paid nothing for the securities, would stand charged with the same duties and subject to the same obligations as was the trust company. It seems to us that the bank stood in this situation. It paid nothing for the notes and mortgages, and they were assigned to it by the trust company in violation of its trust. In this state of the case the cestui que trust had a choice of remedies. He could follow the trust property, or he could sue the trustee for a breach of the trust agreement. It is neither unjust nor inequitable, as between him and the bank, that he should have the benefit of one of these remedies. When the trust company transferred the securities to the bank, the latter had no interest in or lien or claim upon them, and it paid nothing for them, while the cestui que trust really held the chief, if not the entire, beneficial interest in them. It will not do, under these circumstances, to permit the trust company to deprive the cestui que trust of all his interest, and vest it in the bank by a mere transfer to the bank without actual consideration of its trustee's title. The charge in the complaint is that the bank has converted the securities of which the plaintiff was the real owner. The defenses of the bank are that the plaintiff is not and was not, but that the bank was, the owner of the securities when it took and used them, and that the question of its ownership of some of them is res adjudicata. Here are no de-

fenses that are not good at law, and the plaintiff's action at law would not have failed if it had not been for the fact that he failed on the trial to establish his legal title to the securities by his evidence. The evidence discloses the fact that the legal title was first vested in the trust company, in trust to collect the securities, or to sell them for their fair value, to pay the expenses of the administration of the trust and the certificate of deposit for $35,000; that the trust company proceeded to make expenditures in the honest administration of the trust for some time, and then transferred its title to the bank, which took it without notice of the trust. Under these circumstances we think the bank took the legal title to the securities which the trust company held, and because it held this legal title and the right to an accounting regarding the expenses incurred by the trust company and itself in the administration of the trust, the cestui que trust had only an equitable interest in the securities, and therefore could not maintain his action at law, but must resort to equity to follow the trust property and enforce the trust. The judgment of the circuit court is affirmed.