LAWS v. FLEMING et al.

(Circuit Court, N. D. West Virginia. April 5, 1910.)

1. COURTS (§ 323*)—PLACE OF RESIDENCE—EVIDENCE.

Evidence *held* sufficient to establish that a complainant was a resident of New Jersey, and merely had a temporary domicile in West Virginia, on an issue of diverse citizenship.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 885, 886; Dec. Dig. § 323.*

Diverse citizenship as a ground of federal jurisdiction, see note to Shipp v. Williams, 10 C. C. A. 249; Mason v. Dullagham, 27 C. C. A. 298.]

2. COURTS (§ 262*)—EQUITY JURISDICTION OF FEDERAL COURTS—ADEQUATE REMEDY AT LAW.

Rev. St. § 723 (U. S. Comp. St. 1901, p. 583), prohibiting suits in equity in federal courts, where plain, adequate, and complete remedy at law can be had, does not deprive equity of jurisdiction if the remedy at law is doubtful, difficult, not adequate to the object, nor so complete as in eq-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

uity, nor so efficient and practicable to the ends of justice and its prompt administration.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 797, 798; Dec. Dig. § 262.*]

3. COURTS (§ 334*)—REMEDIES—EQUITY—FEDERAL COURTS.

The West Virginia rule that, where usury has been paid and the transaction is closed, the borrower may recover the usury paid in assumpsit for money had and received, but, if the debt or any part of it on which usury has been paid remains unpaid, a court of equity may be appealed to, which in stating the account between the parties will credit on the principal of the unpaid part whatever usurious interest has been paid, and give the lender a decree for his debt with legal interest only, is enforceable in federal courts sitting in that state under the rule that the public policy of a state with respect to contracts made within it is obligatory on federal courts, whether acting in equity or at law.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 899, 910; Dec. Dig. § 334.*]

4. USURY (§ 117*)—EVIDENCE.

Evidence *held* to require a finding that a transfer of corporate stock to defendant in consideration of defendant's services in assisting in the construction and financing of a railroad was in fact a mere cover for usury contracted to be paid on a loan of money made by defendant to complainant.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 328–340; Dec. Dig. § 117.*]

Suit by William M. Laws against Thomas W. Fleming and another. Decree for complainant.

William M. Laws, alleging himself to be a citizen of New Jersey, has filed his bill against the defendants Thomas W. and Allison S. Fleming, charging: That in October, 1908, he was the owner of a majority of the capital stock and bonds of the Fairmont & Mannington Railroad Company, a West Virginia corporation, operating an electric railway between the cities of Fairmont and Mannington, in Marion county, W. Va., and was engaged in the financing and construction of the road. That defendant Thomas W. Fleming was at the time a stockholder and director of this railroad company, and his son, the defendant Allison S. Fleming, was its secretary and treasurer. That it became necessary in the construction of the road to raise immediately a sum of $30,000, and plaintiff entered into an agreement with said Thomas W. Fleming, whereby the latter agreed to furnish $18,000 in cash and to indorse plaintiff's note or notes for $12,000. To secure this sum and the indorsements aforesaid, plaintiff was to deliver to said Thomas W. Fleming, as collateral security, 50 of the first-mortgage bonds of said railroad company of the par value of $1,000 each, and, further, as an usurious consideration for said loan and indorsements, he agreed to deliver to said Fleming 1,500 shares of the capital stock of said company; the par value of such stock aggregating $150,000. It is then charged that Thomas W. Fleming on October 12, 1908, did, in accord with this agreement, deliver to plaintiff $18,000, and for this sum and the further one of $5,000 at a prior period secured from him plaintiff executed his note payable, with interest, six months thereafter for $23,000, and delivered the same with 50 of the railroad bonds as collateral security to said Thomas W. Fleming; that in further execution of said agreement, and without further consideration, he delivered to him 1,500 shares of the capital stock of the railroad company.

The bill then charges that this note for $23,000, when it became due, was renewed for a period of four months, $690 interest being paid; that the defendant Thomas W. Fleming refused to indorse notes for the $12,000 or any part thereof as agreed, caused his son, as secretary and treasurer of the company, to transfer to him the 1,500 shares of capital stock, has refused to surrender the same, retains 38 of said first-mortgage bonds (having surrendered 12 thereof upon payment of certain sums set forth), and has caused said 1,500

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

shares of capital stock to be assigned on the books of the company to his son, the defendant Allison S. Fleming, wholly without consideration, and with full notice on the part of said Allison S. Fleming of all the facts and conditions under which the same was obtained by him, the said Thomas W. Fleming. It is then charged that the $23,000 note is not due, that plaintiff is able and anxious to pay when due, but that the consideration thereof was usurious to the extent of the value of said 1,500 shares of stock, which it is charged said Flemings are seeking to sell and dispose of, and the prayer is ..or an injunction restraining the transfer of said note and bonds and the selling of such stock for an ascertainment of its value and credit therefor upon such note, and for general relief.

On May 25, 1909, a temporary restraining order was granted and the cause set down for hearing on June 8, 1909, upon plaintiff's motion for injunction. Upon this hearing, defendants filed their demurrer to the bill, and on September 24th following this demurrer was overruled, whereupon defendants filed answer, to which replication was filed, the defendants moved a dissolution of the restraining order, which motion was overruled and time was fixed for parties to take proofs. The defendants moved to require additional bond of plaintiff, which motion was sustained and additional bond was required to be given in 10 days, but plaintiff was allowed within that time to pay into court said $23,000, with its accrued interest, if he preferred doing so to giving additional bond. Six days after the plaintiff paid into court the sum of $23,632.50, the principal and interest due upon said $23,000 note, and on October 6, 1909, a consent decree was entered directing the deposit for surrender to plaintiff of the 38 bonds held by Fleming to secure this note, the deposit of the 1,500 shares of the capital stock held by Allison S. Fleming which was to abide such disposition as the court should by future decree make, whether by way of abatement or surrender, in case the court should hold it to have been an usurious exaction. And thereupon such stock and bonds were deposited, said bonds surrendered to plaintiff, and the $23,632.50 paid into court was directed to be paid to said Thomas W. Fleming.

The material allegations of the answer filed are a denial of the agreement as stated in the bill, and especially as to Thomas W. Fleming's obligation to indorse plaintiff's notes for $12,000. On the contrary, it is stated that at the time of the transaction Laws owed Fleming a note then due for $5,000; that, in addition to this, Fleming was indorser for Laws upon two notes, aggregating $7,600, for which he held 22 of the railroad company's bonds for security; that he, in fact, loaned Laws $18,000 in cash, and for this and the $5,000 note due Laws executed to him the $23,000 note, and delivered to him 28 additional bonds. It is then alleged that "in consideration of said defendant Thomas W. Fleming remaining his accommodation indorser for said notes aggregating $7,600, and in consideration of the indebtedness of said plaintiff to said Thomas W. Fleming for valuable services before that time and thereafter to be rendered by said Thomas W. Fleming to said plaintiff," Laws was to deliver to him the 1,500 shares of stock. It is admitted that subsequently the $7,600 indebtedness for which Fleming was indorser was paid by Laws, and that he surrendered on account thereof 12 of the 50 bonds held by him to Laws.

At the January term, 1910, at Parkersburg, the defendants filed a motion to dismiss, alleging plaintiff to be a resident of West Virginia, and not of New Jersey, affidavits were filed as to this, and the cause was submitted upon this motion and the merits.

E. M. Showalter, L. S. Schwenck, and Harry Shaw, for complainant. Reese Blizzard, John Marshall, and W. S. Meredith, for defendants.

DAYTON, District Judge (after stating the facts as above). The controversy here resolves itself into three questions: First. Was plaintiff, Laws, at the time of the institution of this suit in fact a citizen of West Virginia, and not of the state of New Jersey? Second. Has this federal court of equity jurisdiction to determine this matter

of usury charged by the bill, or was the remedy at law? Third. Were the transactions set forth in fact usurious?

The first question arises upon a motion to dismiss made at the time the cause was argued and submitted, but with leave to defendants to file depositions or affidavits in support of such motions within 10 days and to plaintiff within 10 days thereafter to file depositions or affidavits in rebuttal. The defendants, in support of this motion, have filed the single deposition of a state court stenographer, who testifies that in a trial had in November, 1909, in a state court in Marion county, her notes show that the plaintiff, Laws, was asked the question "When did you first make Fairmont your home?" and replied, "About the first of the year." In opposition to this, the plaintiff in his bill charged himself to be a citizen of New Jersey, which bill is sworn to by him. The answer of defendants filed states that they are advised that the plaintiff is a citizen of New Jersey, and this answer is sworn to by both of them. In addition to this, plaintiff has filed his affidavit under the leave given and within the time limited, in which he asserts his citizenship to be in New Jersey, where he is a registered voter, pays his poll tax, has a furnished house temporarily closed, and that because of his connection with the building of this railroad requiring most of his time on the ground he in May, 1909, brought his family to Fairmont, boarded a month with them at a hotel, then secured a furnished house which he rented by the month, in which he has temporarily resided, but with no intention whatever of establishing his citizenship there or changing it from Jersey City, and that his answer to the question referred to in the state trial referred solely to his temporary residence in Fairmont, and not to his citizenship in New Jersey. Under these circumstances this motion must be overruled.

The second question arose upon and was disposed of by the overruling of the demurrer, but is again relied on upon this final hearing. It would seem that this defense was waived by the consent decree of October 6, 1909, whereby the bonds and stock were deposited in court by the defendants, the principal and interest of the $23,000 note were also deposited by the plaintiff, the bonds were delivered over to the plaintiff, the money to the defendant T. W. Fleming, and the stock alone was retained to abide the future decision of this court as to whether the contract between the parties was usurious or not. However this may be, a careful review of the question involved has confirmed my opinion, held on demurrer, that this bill could be maintained. While it is true section 723, Rev. St. (U. S. Comp. St. 1901, p. 583), prohibits suits in equity in federal courts where a plain, adequate, and complete remedy at law can be had, it is also true that, construing this statute, the courts have held that the remedy at law must not only be plain and adequate, but it must also be complete, and, if the remedy at law is doubtful, difficult, not adequate to the object, not so complete as in equity, nor so efficient and practicable to the ends of justice and its prompt administration, then equity will take jurisdiction. Whitehead v. Shattuck, 138 U. S. 151, 11 Sup. Ct. 276, 34 L. Ed. 873; Spokane Mill Co. v. Post (C. C.) 50 Fed. 431; Smith v. Am. Nat. Bank, 89 Fed. 840, 32 C. C. A. 368; Rumbarger v. Yokum (C. C.) 174 Fed. 55. That an action at law to recover for the usury paid is not a

plain and adequate one has been recognized by the courts of Virginia and West Virginia for more than a hundred years. Section 7, c. 96 (section 3432), of the Code of this state, taken from the Code of Virginia of 1860 (chapter 141), expressly provides:

"Any borrower of money or other thing may exhibit a bill in equity against the lender and compel him to discover upon oath the money or thing really lent, and all bargains, contracts, or shifts relative to such loan, and the interest or consideration of the same; and if it appear that more than lawful interest was reserved, the lender shall recover his principal money or other thing *with six per cent. interest only but shall recover no costs.* If property has been conveyed to secure the payment of the debt, and a sale thereof is about to be made, or is apprehended, an injunction may be awarded to prevent such sale pending the suit."·

The first part of this section was embodied in Acts Va. 1796 (chapter 16, § 3), except there appears therein in lieu of the words I have italicized the words "without interest, and pay the costs of suit."

For 40 years in Virginia, beginning with the case of Marks v. Morris, 4 Hen. & M. 463, a great controversy was waged over the operation of this statute upon the security held by the lender of a usurious debt. Marks v. Morris was reversed by the Supreme Court of·Appeals (2 Munf. 407, 5 Am. Dec. 481), and its reversal was finally overruled in Bell v. Calhoun, 8 Grat. 22. Without reviewing this controversy and its final settlement through the numerous cases and by statute, because such review has been made by Green, Judge, in Davis v. Demming, 12 W. Va. 246, it is sufficient to say that the practice in Virginia and West Virginia is now very clearly laid down in Norvell v. Hedrick, 21 W. Va. 523, where it is held:

"Where usurious interest has been paid and the transaction closed, the borrower may recover back from the lender the excess so paid beyond the legal rate, in an action of assumpsit for money had and received; but if the debt, or any part of it, on which such usurious interest has been paid, remains unpaid, a court of equity in stating the account between the parties will credit upon the principal of such unpaid part whatever usurious interest has been paid, and give the lender a decree for his debt, with legal interest only."

From this and other decisions in this state the rule is well established that a borrower can do one of two things: First, pay his debt and the usurious interest and then in an action at law recover back the usury; or, second, before payment of the debt, bring his bill in equity, and by an accounting have the usury ascertained and credited upon the debt as of date of such usurious payments.

But it is insisted that this rule does not apply to federal courts, and that they should not adopt the state practice. It would seem clear that the reason for the state rule has been because the remedy at law was not plain and adequate. A borrower who for years has paid usury might upon accounting had and credit given on his debt for such usury paid be entirely able, without sacrifice of his property, to pay the balance of the debt, while, to compel payment of the debt before he could obtain relief, might effect his financial ruin. As we have seen, the rule is just as well settled in federal practice as in state practice that, where the remedy at law is not full, complete, and adequate, resort can be had to equity, and no reason can be shown why the enforcement of a substantive state statute relating to usury should be an exception to the

rule. In fact, if I have rightly comprehended the federal decisions, they expressly hold to the contrary.

In Missouri, Kansas & Texas Trust Co. v. Krumseig, 172 U. S. 351, 19 Sup. Ct. 179, 43 L. Ed. 474, it is said:

"Usury is, of course, merely a statutory offense, and federal courts in dealing with such a question must look to the laws of the state where the transaction took place, and follow the construction put upon such laws by the state courts [citing De Wolf v. Johnson, 10 Wheat. 367, 6 L. Ed. 343; Scudder v. Union National Bank, 91 U. S. 406, 23 L. Ed. 245]."

And again:

"The public policy of a state with respect to contracts made within the state and sought to be enforced therein is obligatory on the federal courts, whether acting in equity or law."

In that case an usurious contract was involved, suit was brought by the borrower in equity for relief against such usury, and such relief was granted. See, also, McIlwaine v. Iseley (C. C.) 96 Fed. 62, and Union M. B. Co. v. Hagood (C. C.) 97 Fed. 360, the opinions in both which were rendered by the late Circuit Judge Siminton of this circuit.

This brings us to the final question, a question solely of fact, whether or not the contract here involved was in fact usurious. It has been held:

"Where, upon a loan of money, the lender besides his principal contracts to receive, in lieu of interest, something which may be worth more than legal interest, though it may perhaps prove to be worth less, as the dividends on bank stock, the contract is usurious." Smith v. Nicholas, 8 Leigh (Va.) 330; Bank v. Stribling, 7 Leigh (Va.) 26.

And:

"A sum allowed a creditor 'for services rendered and settled' (but not specified) amounting to 9 per centum per annum was considered usurious; it appearing that the pretended services were rendered only in exertions to secure the debt for the creditor's own benefit." Stone v. Ware, 6 Munf. (Va.) 541.

And again:

"This statute (against usury) contemplates substitutionary colorable arrangements, and the various shifts and devices that are often used to cover up the usury; but law requires the lender on oath to discover the money really lent, and all bargains, contracts, or shifts relative to such loans, and makes them ineffectual, no matter how complicated they be. The law evidently intends that the search for usury shall penetrate to the substance." Crim v. Post, 41 W. Va. 397, 23 S. E. 613.

Also:

"The Legislature in their later statutes, giving up the vain pursuit of usury in its particular forms, and striking at the root of the evil, have forbidden the taking exorbitant interest directly or indirectly; thus throwing upon the ministers of the law the duty of detecting and defeating every attempted evasion of it. Well may these ministers exclaim, 'Quo teneam vultus mutantem Protea nodo?' Yet are they bound to pursue this Proteus through all his changing forms; and the law has given them ample powers." Whitworth v. Adams, 5 Rand. (Va.) 333.

See, also, Watkins v. Taylor, 2 Munf. (Va.) 424, 5 Am. Dec. 486, opinion of Roane, Judge, reported in 3 Munf. 595; Bank v. Kirby, 100 Va. 498, 42 S. E. 303; Ware v. Bankers' Loan, etc., Co., 95 Va. 680,

29 S. E. 744, 64 Am. St. Rep. 826; Nat. M. Bldg. Ass'n v. Ashworth, 91 Va. 706, 22 S. E. 521; Vangilder v. Hoffman, 22 W. Va. 1.

As briefly as we can, sifting the facts involved here, we find that this Fairmont & Mannington Railroad Company was organized by defendant Thomas W. Fleming and others without any substantial contribution to its capital stock; each one of the seven promoters subscribing for one share of the par value of $100. Fleming was elected president of the company, and his son, the defendant Allison S. Fleming, was at first elected secretary, and subsequently in addition treasurer of it. These positions were held by them for nearly five years, until May 10, 1909. The authorized capital was $1,000,000 and a bond issue of $600.000 was also authorized. Thomas W. Fleming and his associates who may be hereafter designated the promoters, as well as the then officers and directors, adopted some of the very common methods of stock manipulation which are so justly causing complaint and condemnation throughout the country. These promoters were voted by the company $93,000 of the capital stock for their compensation as such, and the defendant Thomas W. Fleming became one of a syndicate which undertook to secure the rights of way for which this syndicate was to receive $24,000 of the bonds subsequently increased to $34,000. In addition to this, an underwriting syndicate was formed to take $100,000 worth of the bonds in denominations of $1,000 each at $850 per bond, and for each bond so taken $3,000 worth of stock was to issue to the one taking the bond. T. W. Fleming, under this arrangement, had subscribed for ten bonds and had actually taken and paid for five of them, so that it will be seen that he had a substantial interest in the successful building and operation of the road by reason of both his stock and bondholdings. In January, 1906, a contract was made by the company with one W. R. Brown, whereby he was to receive $423,000 of its bonds and 9,993 shares of its capital stock in consideration of his building and equipping the road from Fairmont to Mannington, a distance of about 14½ miles. Brown commenced February following and continued work until the fall of 1906, when he became financially embarrassed, and had to stop. At the instance of A. L. Pearson and C. I. Shannon. who had purchased from Brown a large number of bonds, a corporation was formed, known as the Buffalo Construction Company, and about April 1, 1907, a contract was entered into between the railroad company and this construction company for the completion of Brown's contract by the latter. The plaintiff, Laws, became the substantial owner of the construction company' interests under this contract, and in its name undertook to complete the road. He began work in June, 1907. He became the owner of the bonds and stock issued to Brown not disposed of by the latter. On or about October 11, 1909, Laws became in urgent need of $30,000 to carry on the work. He applied to C. W. Watson in New York for a loan of this amount. Watson agreed to secure him this sum if he would secure defendant T. W. Fleming to indorse the note, and would assign to him, Watson, absolutely $100,000 of the capital stock. Laws went to Fairmont, and, while walking over the line of the road, informed Fleming of Watson's proposition. Flem-

ing at once condemned it as unreasonable. Later in the day Fleming and Laws entered into the verbal contract in controversy. Distinct conflict exists as to what the terms of this contract were. Laws insists that by it Fleming was to furnish him $18,000 in cash, and was to indorse for him paper to the amount of $12,000 additional, for which he, Laws, was to, and did, execute his note for $23,000 payable in six months, which included besides the $18,000 cash the sum of $5,000 which he, Laws, at the time owed Fleming. For this loan and promised indorsement Fleming was to have $50,000 of bonds as collateral security and an assignment of 1,500 shares of the capital stock. Laws insists that, after the execution of the $23,000 note, Fleming refused to indorse for the $12,000 and that the stock which he estimates to be now worth 30 cents on the dollar, or $15,000, was given as a usurious consideration for the loan of $18,000 and the promised indorsement for $12,000. On the other hand, Fleming insists that at the time he held Laws' overdue note for $5,000 and was indorser for him upon two notes (which he admits were subsequently paid) for $5,000 and $2,600, respectively; that he loaned him the $18,000 in cash, took the note for $23,000, which included the $5,000 overdue note which was secured by the bonds; that, after this arrangement was made, he called Laws' attention to the fact that in June, 1907, in New York City, he, Laws, had said to him, Fleming, that he would depend upon him (Fleming) to assist him (Laws) in the undertaking, and would see that he (Fleming) "was properly cared for." Quoting Fleming's language:

"I said: 'I have been indorsing paper for you and have been doing a great deal of work for you, and have given my entire time on this road, looking after its construction and aiding you in every way possible, and I think now it is a good time for us to have an understanding with reference to what I am to be paid for my services.' He wanted to know if I would be willing to accept $100,000 of stock. I said I should have $150,000 worth of stock; that the stock so far as the value was concerned it was of no value, but I felt that I had rendered sufficient services that I was entitled to that stock. Mr. Laws says: 'All right, Mr. Fleming, I will agree to give you $150,000 worth of this stock.'"

Fleming in this statement is corroborated by his son. Laws denies that the question of "services" was discussed in connection with the transaction, or that he ever agreed "to take care of Fleming," or that the services rendered by Fleming were other than those performed by him as president of the railroad company and interested financially in its success.

I have studied this evidence long and carefully, and I am driven to the conclusion that the issuing of this stock to Fleming was in fact an usurious shift or device forbidden by the statute. Without entering into an extended discussion of the evidence, it seems to me to be clear that Laws at the time was laboring under great financial stress and had to have money. He could procure it from Watson only upon condition that Fleming would indorse or become surety for it and Laws would give him $100,000 stock. Fleming had clearly indicated in the morning walk along the line of road that his indorsement could not be obtained. Laws was clearly at the end of his rope. It was under such conditions that Fleming agreed to let him have $18,000, and, as

suming his statements to be entirely true, brought up the subject of "his being taken care of." It cannot be denied that at the time he did so Laws did not have in hand the promised $18,000; that was not to be delivered until a morning or two after. Fleming, he knew, could refuse to furnish it still if he, Laws, did not accede to his demands. He had to have the money, so he acceded. Touching these services claimed to be rendered, it is to be noted that Fleming had never demanded or mentioned compensation for them before. So far as shown, he had kept no account of them on book or otherwise, had rendered no account thereof, and this evidence discloses that they were of such character as might well have been expected of the president of a road who had large pecuniary interests personally at stake in its building and equipment alone upon watered stock and a greatly inflated bond issue. It seems to me the case comes under the principles laid down in Stone v. Ware, 6 Munf. (Va.) 541.

By reason of the terms of the consent decree of October 6, 1909, the procedure herein will be greatly simplified. It will only be necessary to direct the clerk and registrar of this court to deliver to the plaintiff the 1,500 shares of stock deposited to abide this decision, and confirm his right to have the same retransferred to him on the books of the company. A decree to this effect will be entered.