**HOWELLS STATE BANK v. NOVOTNY et al.**
No. 9769.

Circuit Court of Appeals, Eighth Circuit.
Jan. 26, 1934.

George W. Wertz, of Schuyler, Neb., and Joseph T. Votava, of Omaha, Neb. (Votava & McGroarty, of Omaha, Neb., on the brief), for appellant.

A. R. Oleson, of Wisner, Neb., for appellees.

Before GARDNER, VAN VALKENBURGH, and BOOTH, Circuit Judges.

GARDNER, Circuit Judge.

This is an appeal from a decree in favor of the appellee Mary Telecky, as guardian for the minor heirs of Jerry Telecky, deceased, awarding to her the proceeds arising from an insurance policy insuring the life of their father, Jerry Telecky.

The proceeding was commenced in the lower court by the New York Life Insurance Company, which filed its bill of interpleader, naming therein as defendants the Howells State Bank, B. J. Novotny, as administrator of the estate of Jerry Telecky, deceased, and the above-mentioned minor children and widow of said deceased. It is disclosed by the bill that the New York Life Insurance Company had issued a policy of insurance on the life of Jerry Telecky; that, while the policy was in effect, the insured departed this life, and that the insurance company admitted liability on the policy; that the various named defendants laid claim to the proceeds of the life insurance. The company asked leave to deposit the insurance money with the registry of the court, in full discharge of its liability under the contract of insurance, that the defendants be required to surrender the insurance policy, and that they be restrained and enjoined from instituting or prosecuting any suit or action on account of said insurance policy, except the proceedings so instituted by the insurance company.

In response to subpoenas served, the various defendants appeared, and the court entered its order granting the prayer of the insurance company; and thereupon the defendant Mary Telecky, as guardian, filed her cross-petition by which she claimed the proceeds of said insurance for her wards, the minor children of deceased, alleging that the said minor children were named as beneficiaries in said policy; that there had been obtained from deceased a purported assignment of the policy and a change in the beneficiary in said policy, wherein and whereby it was sought to make the executors, administrators, or assigns the new beneficiaries therein, and that, because of said purported change, B. J. Novotny, as administrator, was making claim to the proceeds, but that the assignment and transfer was null and void; further, that on or about the 15th of February, 1932, there was obtained from the insured by the Howells State Bank a purported assignment of the policy as collateral security for indebtedness of said insured to said bank, but that said assignment and transfer was null and void, it being alleged that at the time of each of said transactions, and for some time prior thereto, the insured was incapable of transacting his business; and that his mental incapacity continued until he committed suicide on February 26, 1932.

The administrator made no answer, but the Howells State Bank answered, putting in issue the claims of the guardian, and alleging that it was entitled to the proceeds because of a pledge of the policy to it as collateral security to indebtedness due it from the insured.

On trial of the suit, the court found the issues in favor of the appellees and against the appellant upon two grounds: (1) That the purported assignment of the insurance policy from the insured to the bank was without consideration; and (2) that at and prior to the time of executing this purported assignment the insured was so affected mentally as to be unfit to transact his business. From the decree entered on the court's decision, the Howells State Bank prosecutes this appeal.

The issues raised by the specifications of error are that there was not sufficient competent evidence to sustain the findings to the effect (1) that the assignment of the policy by the insured was without consideration; (2) that the insured was of such unsound mind as to be unfit to transact business at and prior to the time of said assignment; and (3) that the testimony of incompetent witnesses was received as to the mental and physical condition of the insured.

■ It is urged that the court, in finding that the assignment of the policy to the bank was without consideration, erroneously placed upon the bank the burden of showing such con-

sideration, whereas it should have presumed, on production of proof of the execution of the instrument, that it was executed for a valuable consideration. As the case was tried to the court without a jury, it is not of the utmost importance whether the court indulged in the first instance the proper presumption or not. The findings of the court are presumptively correct, and will not ordinarily be disturbed on appeal unless clearly against the weight of the evidence, or based upon an erroneous view of the law. Klaber v. Lakenan (C. C. A. 8) 64 F.(2d) 86; Johnson v. Umsted (C. C. A. 8) 64 F.(2d) 316; Karn v. Andresen (C. C. A. 8) 60 F.(2d) 427; Conqueror Trust Co. v. Fidelity & Deposit Co. (C. C. A. 8) 63 F.(2d) 833; Twyman v. Radiant Glass Co. (C. C. A. 8) 56 F.(2d) 119; Kingston v. American Car & Foundry Co. (C. C. A.) 55 F.(2d) 132; Brace v. Gauger-Korsmo Const. Co. (C. C. A. 8) 36 F.(2d) 661. Unless, therefore, the findings of the court are clearly against the preponderance of the evidence, they should not be disturbed.

It is the contention of the bank that by this assignment the policy was pledged to it as collateral security to two notes which the insured owed the bank, that on the 4th day of February it extended the time of payment of these notes, and that the granting of this extension was the consideration for the assignment. The assignment, however, was not executed on the 4th of February, but on the 5th of February, after it is claimed the time of payment of the notes had already been extended. True, the officer of the bank testified that these transactions were all one, but the court held that this testimony was not competent because it related to transactions with the deceased, and under the Nebraska statute (section 7894, Revised Statutes 1913) was not admissible.

We think counsel for appellant confuse the rule with reference to the burden of proof and the burden of evidence. The burden of proof rests upon the party who has the affirmative of the issue, and the court correctly held that the burden was upon the bank to show a consideration for the assignment of the policy. Whether or not, upon the production of the assignment and proof of its execution, the burden of evidence may have shifted, is a different question, but the burden of proof, strictly speaking, never shifts.

The instrument, standing alone, may well have imported a consideration, but, when it was claimed by the bank that the actual consideration for the assignment was the extension of time of payment of the notes, it cannot be said that there was a presumption that such was the consideration. It was the claim of the bank, not only that there was a consideration, but that there was a particular specific kind or character of consideration. It did not rely upon the presumption of law, but contended and attempted to make proof of the specific nature and character of the consideration.

There being a claim that a specific act of the bank constituted the consideration, we think the court did not err in holding that it was incumbent upon the bank to make proof of such consideration. The assignment having been made on a day subsequent to the alleged extension, coupled with the further fact appearing in the evidence that the bank subsequently gave notice to the insured that his notes were due and demanded payment thereof, indicating that the bank did not recognize that the time of payment had been extended, and the further fact that the instruments produced by the bank purporting to prove the extension were not executed by the bank, but by the insured, warranted the court in placing upon the bank the burden of proving the consideration for the assignment of the policy.

The so-called extension agreements, as we have already observed, were not delivered to the insured, nor were they executed by the bank. If the bank acted upon them, and, in fact, extended the time, these extensions would doubtless be binding upon the insured, who was the maker of the notes. But the subsequent action of the bank would seem to indicate that it had not extended the notes, but demanded payment notwithstanding the fact that the maker of the notes had signed the extension agreements.

In this condition of the record, we cannot say that the finding of the court on this issue is against the preponderance of the evidence. But, if this issue could be resolved in favor of the appellant, it would not effect a reversal of the judgment if the court's finding that the insured was of unsound mind and so affected mentally as to be unfit to transact business is sustained by the evidence.

There is, of course, in the first instance, a presumption of mental capacity, and hence on this issue the burden of proof rested upon the appellees. Not every impairment of mind disqualifies one from transacting business. To constitute such disqualification, there must be such mental impairment

as to render the person incapable of understanding and acting with discretion in the business affair under consideration. In support of the claim of mental incapacity, it is contended that there was evidence of (1) hereditary taint; (2) surrounding circumstances showing general conduct, appearance, and acts inconsistent with his previous habits; (3) proof of his attempt to commit suicide, his threats to commit homicide, and proof of suicide. It will be necessary to examine the evidence in some detail.

One of the insured's sisters was insane, and at the time of the trial had been under treatment at the Norfolk Insane Hospital for twelve years for her mental disorder, and was growing worse. She was afflicted with some homicidal mania, "would try to kill her husband and she would appear awfully religious, pretending she is God, or that she was raising people from the grave." The insured's oldest brother had also been insane and had been treated for mental disorder and had been sent to an institution for treatment. Another sister of the insured was a sufferer from mental disorder. She "tried to commit suicide continually." A niece of deceased was at the time of the trial an inmate of the Insane Hospital at Norfolk, Neb., where she had been treated for mental disorders for seven years. For two years prior to entering the hospital at Norfolk, she had been at Green Gables, at Lincoln, Neb., for similar treatment. She was apparently a sufferer from homicidal mania.

This proof of hereditary taint was, at least so far as it related to the insanity of the brother and sisters, to be considered in connection with other evidence. Proof of this taint of insanity in deceased's family, without some evidence going to show insanity in the deceased himself, would not, of course, overcome the presumption of sanity; but it was proper evidence to be considered in connection with other circumstances. A few of these circumstances will be referred to.

It is not possible within reasonable bounds to reproduce the testimony as to various facts and circumstances indicating mental incompetency of the deceased. A brother testified to an incident indicating that the deceased, shortly before his death, bitterly complained that he was without straw enough, and shortly thereafter saying that he had plenty of straw and straw to sell. A daughter testified to his abnormal conduct in playing cards, indicating that he made mistakes he was not accustomed to make. Many witnesses testified to marked changes in his personal appearance and in his actions. He had customarily been particular about his personal appearance, but he had become slovenly and much of the time went unshaved, was extremely nervous, talked at random, changing from one subject to the other without any apparent cause. At one time, within a month or two before his death, he insisted to the hired man that the harness hanging in the barn was down, although it was perfectly apparent that it was not. When on the highway with the hired man, he stopped without any apparent reason, and told the hired man not to have anything to do with his (deceased's) brother, although up to that time the brothers had been on good terms. This witness testified, among other things, as follows:

"He looked kind of red in the face and I noticed he was talking out of his way, talking here and there that didn't amount to anything, he said so much of little things that could not be remembered, but what was said had no connection with what he was doing and did not amount to anything at all. He kept this up for every bit of the three or four months before he died. Before this he was all right, nothing wrong with him. I noticed the last months he was getting funny. He did not even eat and he was glum and grouchy the biggest part of the time, and did not sleep at night, but was up and around worrying about things. You could see he was worrying and from his talk I knew he was off. He made statements he never made before and he never talked like that before. * * * Four months before his death he appeared to be acting funny like and it kept getting worse towards the last, and he would not care for his stock and started getting careless about everything. He would not feed the stock, and I did the most of it. Before that he used to take an interest in his stock and he would take care of everything. The last time I saw him alive was the day and evening before he killed himself. I was at the house and he was gone to town the biggest part of the time, and driving around, but he was not around the place until evening. He spent a little time asking me how things were getting along, but he paid no attention to the answers given him. He looked to me like he didn't know where he was at. His eyes were bloodshot and he was not that way before. He spent a good deal of his time awake and up and around, and I could hear him rambling about the house during the night, a number of times every night, for some time before he killed himself. The

way he talked I could get an idea that he was worrying about some insurance matter. He said to me that he had all kinds of trouble but did not tell what it was. The last four months he kept getting worse and worse and I knew something was wrong. He would not look after anything on the place."

A brother of the deceased testified that he saw deceased frequently during the four months preceding his death; that during that time his appearance changed a great deal, and he acted differently. His eyes were stary, and he did not pay attention to things.

There was testimony that an officer of the bank stated that, when the insured was at his bank on February 4th, or thereabouts, he acted "very queer, and sometimes he didn't know what he was talking about."

The surviving widow and other members of deceased's family testified to the deceased's acts, conduct, and appearance, his loss of appetite, sleeplessness, incoherence of his conversation, his previous attempt to commit suicide, and other attending circumstances.

Early in February, 1932, insured "had a rope ready in the shed and cans to stand on, to hang himself with." When discovered, he was standing by the shed and the rope hung from a timber in the car shed. The witness to this incident testified: "I seen he wanted to hang himself. I ain't allowed to tell what he told me. That is all I seen, that he wanted to hang himself."

His actions were such as to arouse the fear and suspicion of his wife so that she hid his gun from him, but, notwithstanding this precaution, he later found the gun and committed suicide on the 26th of February, 1932. There was evidence that he threatened to shoot an officer of the bank, but the competency of the witness who testified to this act may be doubted.

All these circumstances had a bearing on the issue of insured's sanity. His attempt to commit suicide and his act of self-destruction must be taken into consideration in connection with his previous conduct. We cannot say that the court's finding on this issue is against the preponderance of the evidence.

It is urged that incompetent evidence was considered by the court. The presumption is that the court did not consider incompetent evidence, and this presumption is strengthened by the record, indicating that the evidence was carefully sifted out, and only competent evidence considered.

The judgment appealed from is therefore affirmed.